**UNITED STATES COURT OF APPEALS**
**Tenth Circuit**
**Byron White United States Courthouse**
**1823 Stout Street**
**Denver, Colorado 80294**
**(303) 844-3157**

Patrick J. Fisher, Jr.                                                                 Elisabeth A. Shumaker
Clerk                                                                                 Chief Deputy Clerk

March 15, 1999


**TO:**   ALL RECIPIENTS OF THE OPINION

**RE:**   97-6217, 97-6225, *Stouffer v. Reynolds*
         Filed on January 15, 1999

        The opinion filed on January 15, 1999, contains a typographical error.  On page 39
of the slip opinion, line 3, first sentence of the first full paragraph, the sentence should read:
"We disagree."

        Please make the correction to your copy of the opinion.

                                        Sincerely,

                                        Patrick Fisher, Clerk of Court


                                        By:
                                                Keith Nelson
                                                Deputy Clerk

**F I L E D**
United States Court of Appeals
Tenth Circuit

JAN 15 1999

**PATRICK FISHER**
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

BIGLER JOBE STOUFFER, II,

      Petitioner-Appellant,

v.

DAN REYNOLDS,

      Respondent-Appellee.

Nos. 97-6217, 97-6225

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CIV-95-401-C)

---

James P. Moran, Assistant Federal Public Defender (Michael G. Katz, Federal Public
Defender, with him on the briefs), Denver, Colorado, for Petitioner Appellant.

Robert L. Whittaker, Assistant Attorney General (W.A. Drew Edmondson, Attorney
General of Oklahoma, with him on the brief), Oklahoma City, Oklahoma, for
Respondent-Appellee.

---

Before **PORFILIO**, **EBEL**, and **KELLY**, Circuit Judges.

---

**PORFILIO**, Circuit Judge.

---

In 1985, an Oklahoma City jury convicted Petitioner Bigler Jobe Stouffer of the first degree murder of Linda Reaves and the shooting with intent to kill her boyfriend, Doug Ivens, whose estranged wife was dating Petitioner. Petitioner was subsequently sentenced to death on the first conviction and life imprisonment on the second. After the denial of his direct appeal, *Stouffer v. State*, 738 P.2d 1349 (Okla. Crim. App. 1987) (*Stouffer I*), *modified in part*, *Stouffer v. State*, 742 P.2d 562 (Okla. Crim. App. 1987) (*Stouffer II*), *cert. denied,* 484 U.S. 1036 (1988), Petitioner unsuccessfully sought state post-conviction relief, *Stouffer v. State*, 817 P.2d 1275 (Okla. Crim. App. 1991) (*Stouffer III*), *cert. denied*, 503 U.S. 965 (1992), raising and exhausting many of the issues presented here. He then filed a petition under 28 U.S.C. § 2254 for habeas corpus relief in federal court positing an array of issues, only six of which are preserved for our review. Pivotal to them is whether Petitioner received the effective assistance of counsel during the guilt and penalty phases of his trial. Because the record does not satisfactorily answer this question, we conclude the district court abused its discretion in failing to hold an evidentiary hearing to plumb the depths of Petitioner's Sixth Amendment argument. However, despite our inability to piece together the record, which is most hampered in assessing counsel's performance during the penalty phase, we accept the district court's conclusion the Oklahoma Court of Criminal Appeals properly reweighed the aggravating and mitigating circumstances after finding no evidence of the heinous, atrocious, or cruel aggravator in *Stouffer II*. We, therefore, vacate the district court's order dismissing the

§ 2254 petition and remand for the court to conduct an evidentiary hearing on the merits of Petitioner's Sixth Amendment claims.

## I.

This murder and shooting occurred in the context of Doug and Velva Ivens' divorce, a setting conducive to two widely divergent versions of events. According to the State, on the night of January 24, 1985, Petitioner, who was dating Velva Ivens after she had separated from Doug, told her he was going out to pick up his mail at his post office box. Instead, Petitioner drove to Doug Ivens' house, not far from Velva's. Petitioner, who had golfed with Doug and served at times as a mediator working out visitation privileges for Doug with his two daughters, rushed in telling Doug he feared Velva and the girls were endangered, victims perhaps of a burglar in their home. Petitioner asked to borrow a gun, and Doug retrieved a loaded .357 magnum Colt Python stored in a bank bag he took from an open case in his bedroom. Handing over the bag, Doug saw Petitioner turn away, look down into the bag, swivel, and shoot. The shots, which entered Doug's chest and arm, awakened Linda Reaves, Doug's girlfriend napping on the couch. As she sat up, Petitioner moved behind her and shot her twice in the head, one bullet piercing the hand she had raised to protect herself. Petitioner then returned to Doug, and, standing over him, fired a fifth shot into his face. Before leaving, Petitioner set the gun on the sofa cushion next to Ms. Reaves and then drove to the post office and back to

Velva's. Left for dead, Mr. Ivens crawled to the telephone and dialed 911, telling the operator Petitioner was the shooter and directing the police to his wife's home.

Petitioner's version differed. In his rendering, Petitioner returned from dinner that night with Velva and her daughters, when Ivens telephoned him at Velva's house asking if he could come by later. Petitioner agreed and drove over. As he neared the house, he noticed two men sitting in a silver and maroon Dodge pickup suddenly drive away. Invited in, Petitioner detected a pungent odor, saw "some legs on the couch," and assumed Ms. Reaves, who visited frequently, was there. Mr. Ivens, nervous and upset, asked him, "how much will it take, for you to get Velva to settle this thing in my terms," referring, he knew, to the contested property distribution in the Ivens' divorce. When Petitioner refused to participate in any scheme, Ivens became irate, pulling a gun he'd tucked into his waistband. In the ensuing struggle, the gun discharged twice, with the third shot, Petitioner believed, hitting Ivens in the stomach. As Petitioner pulled the gun away, it fired a fourth time. Petitioner explained he fired the fifth shot, although Ivens lay bleeding, thinking he saw another gun in Ivens' hand. Petitioner then left, stopped by the post office, and returned to Velva's where the police were waiting. In his version, although he had shot Ivens in self-defense, Ms. Reaves was either dead when he arrived or killed by a ricocheting bullet.[1]

_____

[1]When Velva asked Petitioner, "What is going on? Did you do it," he responded, "No, I did not do it. There's a lot of confusion ... You'll understand later." Questioned later by the police at the station, Petitioner stated he had not been at Ivens' house that
(continued...)

At trial, the State built its case on the testimony of investigating police, forensic experts, and Doug and Velva Ivens. The evidence was framed by the State's theory that Petitioner, fearing he was losing Velva, in a cold and calculating fashion, attempted to remove the individual responsible for his loss only to confront an innocent witness he had not expected to be present. Defense counsel parried this version solely with Petitioner's testimony he acted in self-defense. Dispatched to deliberate at 4:15 p.m., the jury returned in less than an hour with its verdict finding Petitioner guilty on both charges.

The court immediately launched the second phase of the trial for the jury to determine Petitioner's sentence. In that proceeding, the prosecutor read the State's bill of particulars enumerating three aggravating circumstances which, it alleged, supported punishment by death: (1) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; (2) the perpetrator knowingly created a great risk of death to more than one person; and (3) the murder was especially heinous, atrocious, or cruel. In its opening statement, the State asked the jury to incorporate the evidence from the guilt phase of the trial to support the allegations.

Without offering an opening statement, defense counsel countered with one witness, Dr. John A. Call, a clinical and forensic psychologist, who had interviewed Petitioner, conducted a mental status examination, and administered several personality

---

[1](...continued)
night and didn't know why Ivens would say Petitioner shot him. In a later conversation with Velva, Petitioner stated, "When I got over there, I was just angry. I just did something I shouldn't have done."

and intelligence tests. Based on these studies, Dr. Call told the jury Petitioner was a "42 year old man, going on 15" with an "atypical personality disorder, with immature and hysterical traits." Dr. Call described the manifestation of this condition in Petitioner's inability to "mak[e] a mature, responsible, adult decision, and acting on that decision, he demonstrates a significant difficulty to do so." Opining that Petitioner could distinguish between right and wrong, Dr. Call underscored Petitioner had the judgment of a teenager, "the teenager who is caught driving the father's car, and being caught red-handed at it, and blaming everyone but himself."

In its closing argument, the State embraced this mitigating evidence, telling the jury,

> Now, does that [aggravating evidence] outweigh what the Defendant has offered as mitigating circumstances? He's offered that he's immature ....
> ....
> The doctor is right. He's different. He's a menace is what he is. No reasonable, nearly normal person could do what he did. And for that there can be only one punishment. This is the appropriate case for death ....
> ....
> They say he's immature. I've got other words for it ... he's unique. He's different .... This crime was outrageous. It was cruel, it was unnecessary. It was committed by a man who is a vicious, cold-blooded, scheming murderer who needs to die.

The jury deliberated for two hours, returning at 11:00 p.m. with the sentence challenged here.

## II. Ineffective Assistance of Counsel

Petitioner's claim of ineffective assistance of counsel presents a mixed question of fact and law, *Cooks v. Ward*, 159 F.3d 1280, 1289 (10th Cir. 1998), which we review de novo applying the law extant before enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA),[2] *Williamson v. Ward*, 110 F.3d 1508, 1513 (10th Cir. 1997). Although we accept the federal district court's factual findings unless they are clearly erroneous and recognize that "[s]tate court factual findings are presumptively correct and are therefore entitled to deference," *Davis v. Executive Dir. of Dept. of Corrections*, 100 F.3d 750, 756 (10th Cir. 1996), *cert. denied*, 117 S. Ct. 1703 (1997), all legal conclusions are subject to our plenary review, *Newsted v. Gibson*, 158 F.3d 1085, 1089 (10th Cir. 1998). However, because the state court did not hold an evidentiary hearing, we "evaluate the factual record as it was." *Miller v. Champion*, ___ F.3d ___, No. 97-6439, 1998 WL 811780, at *6 (10th Cir. Okla. 1998).

Petitioner presents three grounds for establishing he was denied the right to competent counsel during both the guilt and penalty phases of his trial: first, counsel labored under a conflict of interest; second, counsel's trial performance was not objectively reasonable and affected the outcome; and, third, counsel's failure to adequately investigate, prepare, and present mitigating evidence effectively invited the jury's sentence. To succeed, Petitioner must not only establish counsel's performance

---

[2]Petitioner filed his federal habeas petition in 1995, the year before enactment of the AEDPA. Further, Oklahoma is not a qualifying state for purposes of the special provisions of the AEDPA applicable to capital cases.

was deficient but also "the deficient performance prejudiced the defense," depriving defendant of a fair trial, "a trial whose result is reliable." **Strickland v. Washington**, 466 U.S. 668, 687 (1984).

## A. Conflict of Interest

At his trial, Petitioner retained Mark Lea (Beau) Cantrell, who had represented him previously in civil actions, and Mr. Cantrell later hired Bill James, a former assistant district attorney, who told the jury he only began working on the case the week before trial. Since **Stouffer I**, Petitioner has maintained both attorneys had actual conflicts of interest in their representation which he did not previously know about, and these conflicts prejudiced his defense. He elaborates that nine years before trial his lead counsel, Mr. Cantrell, served as a county representative in the gubernatorial campaign of Ron Shotts, the attorney who filed Mr. Ivens' civil action attaching Petitioner's assets the day after the shootings occurred. Seven years before this trial, Petitioner states Mr. James filed a criminal case charging him with arson but sometime later dismissed the action because of insufficient evidence.

In **Stouffer I**, the Oklahoma Court of Criminal Appeals rejected these assertions not only because the conflicts were too remote in time to have prejudiced him, but also because Petitioner, by allowing both attorneys to represent him, waived any possible conflict. In his federal habeas, the district court concluded the seven-year interval and absence of any specific evidence of instances of divided loyalty in which the prior

- 8 -

prosecution might have altered Mr. James' present performance dispelled Petitioner's contention counsel had an actual conflict of interest based on the analysis in *United States v. Gallegos*, 39 F.3d 276, 278 (10th Cir. 1994). As to Mr. Cantrell's representation, the district court noted Petitioner had also failed to identify the precise campaign relationship between Mr. Shotts and Mr. Cantrell or describe any contact between the two to support the alleged conflict based on his attorney's previously being "a political supporter of unknown intensity for an attorney and friend of a government witness."

Now, Petitioner asks we view these conflicts within the context of "the apparent insularity of the Oklahoma legal community" and, while recognizing the usual setting for a conflict is that of dual, successive, or simultaneous representation, urges his case is an analog, albeit less well established, and demands similar scrutiny. Petitioner relies on *United States v. Ziegenhagen*, 890 F.2d 937, 940 (7th Cir. 1989), to shape our analysis, likening Mr. Cantrell's involvement in the civil litigation with Mr. Shotts to "directly related prior litigation" and Mr. James' actively leading a prior prosecution against him to an actual conflict of interest. At a minimum, Petitioner requests we remand this issue for an evidentiary hearing to determine whether the conflict had an adverse effect on his representation in light of his attorneys' performance during trial.

The Sixth Amendment's right to the effective assistance of competent counsel includes the right to conflict-free representation, *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980), and is rooted in "the fundamental right to a fair trial." *Strickland*, 466 U.S. at

684. "Lawyers in criminal cases ... are the means through which the other rights of the person on trial are secured." *United States v. Cronic,* 466 U.S. 648, 653 (1984). The principle is unchanged when defendant retains his own lawyer, as here. "The vital guarantee of the Sixth Amendment would stand for little if the often uninformed decision to retain a particular lawyer could reduce or forfeit the defendant's entitlement to constitutional protection." *Cuyler*, 446 U.S. at 344. Ultimately, we judge the fairness of the trial itself through the Sixth Amendment lens looking to determine if counsel has subjected each bit of evidence, each element of the prosecution's case, to reasonable adversarial testing. *Strickland*, 466 U.S. at 685. Thus, when appointed or retained counsel operates under an actual conflict of interest, we presume the adversarial balance has been altered and prejudice inures to the defendant, affecting the adequacy of representation. *Edens v. Hannigan*, 87 F.3d 1109, 1114 (10th Cir. 1996).

In this case, because Petitioner did not object at trial to his representation by either Mr. Cantrell, whom he retained, or Mr. James,[3] he must demonstrate an actual conflict of interest which adversely affected his attorneys' performance by pointing to specific instances of actions adverse to his interests. *United States v. Alvarez*, 137 F.3d 1249, 1251 (10th Cir. 1998). However, aside from asking us to take judicial notice of "the

_____

[3]Because none of these assertions has ever been subjected to an evidentiary hearing, we do not know whether Mr. Cantrell signed Mr. James on to the defense one week before trial because Mr. Cantrell, in fact, had never tried a capital case or because he had little experience trying criminal cases.

- 10 -

apparent insularity of the Oklahoma legal community,"[4] Petitioner has advanced no particular "instances in the record which suggest an impairment or compromise of his interests for the benefit of another party." *Id.* at 1252 (citation and internal quotation marks omitted).

Absent this showing, the state's historical factual findings that the prior associations were too remote in time, while entitled to our deference, are not alone dispositive of whether individual counsel suffered under such a conflict. Indeed, as Petitioner has advanced, in *Ziegenhagen,* the alleged conflict by a prosecutor who recommended prior sentences later used to enhance defendant's sentence occurred twenty years before the challenged representation. 890 F.2d at 938. Thus, the passage of time alone cannot ameliorate a specific instance of a conflict. Moreover, absent any factual findings in the record, the state court's conclusion Petitioner waived the alleged conflict is not entitled to deferential treatment. "[T]he waiver of a constitutional right must not only be voluntary, but must be a knowing, intelligent act 'done with sufficient awareness of the relevant circumstances and likely consequences.'" *United States v. Gallegos*, 108 F.3d 1272, 1281 (10th Cir. 1997) (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)).[5] Were we to have to make such a determination, we would "'indulge every

[4]However, not only is this type of evidence not subject to judicial notice, but also, the argument is not appropriate for that evidentiary leap.

[5]In *United States v. Ziegenhagen*, 890 F.2d 937 (7th Cir. 1989), the court remanded the case for an evidentiary hearing to determine whether defendant made a

(continued...)

- 11 -

reasonable presumption against the waiver.'" *Gallegos*, 108 F.3d at 1281 (quoting *Glasser v. United States*, 315 U.S. 60, 70 (1942)).[6] Again, the record does not provide us with any factual basis for such a determination, no hearing having been held.

Consequently, in the absence of an objection at trial or citation of specific instances of compromised representation in the record, we hold the district court did not err in rejecting Petitioner's claim of ineffective assistance of counsel based on his attorneys' prior associations. We further decline Petitioner's invitation to analogize the prior alleged adverse interests as tantamount to joint or successive representation. Although we do raise questions about the adequacy of trial counsel's performance, those concerns do not derive from the alleged conflicts of interest but are confined to the trial arena as contemplated by *Strickland.*

## B. Deficient Trial Performance

In challenging his attorneys' performance at trial, Petitioner does indicate specific instances alleged to fall below an objective standard of reasonableness. With citations to the record, Petitioner catalogs lead counsel Mr. Cantrell's failure to prepare and present a certified copy of a defense exhibit to buttress Petitioner's self-defense theory; Mr. Cantrell's inability to conduct the direct examination of his witnesses without asking

---

[5](...continued)
knowing and intelligent waiver of the conflict.

[6]The district court did not address the question whether Petitioner waived the alleged conflict. Its resolution is not necessary for our holding either.

leading questions; counsel's failure to assert and explicate challenges for cause in seating members of the jury who had police connections or a close personal friend who had been shot; counsel's cross-examination of the State's witnesses, which, most often served to restate and highlight the most damaging elements of the direct testimony; counsel's failure to deliver an opening statement at either phase of his trial; and Mr. Cantrell's "rambling, incoherent, and irrelevant recitation of historical anecdotes and patriotic platitudes" during his closing argument which provided the prosecutor with another opportunity to seize on the apparent weakness of Petitioner's case to the jury. Indeed, Petitioner asserts the "impression left by counsel's performance was that Mr. Stouffer had no viable defense." Petitioner contends these examples demonstrate counsel failed to "exercise the skill, judgment and diligence of a reasonably competent defense attorney." *Dyer v. Crisp*, 613 F.2d 275, 278 (10th Cir. 1980) (en banc).

*Strickland*'s admonition "[j]udicial scrutiny of counsel's performance must be highly deferential" free from the "distorting effects of hindsight" guides our review of the record. 466 U.S. at 689. Moreover, a wide swath of that conduct is cut for *sound trial strategy. Id.* Nonetheless, we are still instructed to determine the objective reasonableness of that performance, looking at the facts of the case at the time of counsel's conduct. *Id.* at 690.

Our concerns about whether the attorneys' trial performance was deficient, the first prong of *Strickland*, focus on the alleged defense that counsel suggested he would mount.

Given this highly publicized murder of a third grade teacher and the involvement of two Oklahoma City businessmen,[7] Petitioner sought to counter with a self-defense scenario, in which he, serving as a go-between for Doug Ivens to visit with his daughters, refused to aid Doug in locking Velva out of her fair share in a property settlement. In a capital case, from the defense perspective, the jury would have to know, however the stretch, how Petitioner became involved in this gruesome event.

In a pre-trial motion, Mr. Cantrell asked to reserve opening statement until he presented his case-in-chief. However, Mr. Cantrell never made an opening statement. In a later affidavit submitted by the Attorney General's Office to the Oklahoma Court of Criminal Appeals (the Affidavit), Mr. Cantrell stated:

> Chief Defense Counsel reserved opening statements as to the first stage of said trial becuase [sic] the state, at the beginning of the trial, had absolutely no fore knowledge [sic] of the defense to be presented. Because of the length of time it would take for the State's case-in-chief to be presented, Chief Defense Counsel believed that an opening statement would alert the state unnecessarily as to defense theories and allow the State to change or alter their case-in-chief so as to minimize the theories of the defense.

Mr. Cantrell does not explain why, given this statement of strategy, he then did not preface the presentation of his defense with an opening statement. Although the federal district court found counsel's failure to present any opening argument was "well within the tactical discretion of counsel," that finding is conjectural given counsel's statement of defense strategy.

---

[7]Reference is made to the publicity surrounding the trial, and the court granted Petitioner's objection to having a television camera in the courtroom.

While the failure to present an opening statement, standing alone, is not ineffective assistance of counsel, *United States v. Haddock*, 12 F.3d 950, 955 (10th Cir. 1993), its absence here serves to underscore the lack of any discernible effort by Petitioner's counsel to present a defense. Indeed, a review of the record establishes, except for Petitioner's testimony, each apparent effort to develop the defense theory was thwarted by defense counsel's objective incompetence. For example, apparently to impeach Mr. Ivens' testimony about his condition after the shooting, Mr. Cantrell attempted to introduce a certified copy of a defense exhibit to show Mr. Ivens directed his attorney to file a civil suit attaching Petitioner's property the day after he was shot. Because the document was not properly file stamped, the court prohibited its admission. Although the federal district court agreed counsel's inability to properly prepare the exhibit for admission fell "below prevailing norms of representation," it faulted Petitioner's argument for failing to show how introduction of this particular document "would have caused a different outcome in the trial," suggesting alternative inferences the jury could have drawn had the exhibit been introduced.[8] However, juxtaposed to the failed defense effort to elicit any testimony about the contested property settlement allegedly involving different bank statements and a life insurance policy and the victim's drinking habits, this particular exhibit remains another unexamined link in an indiscernible defense. In each

[8]Although even the state trial court made reference to the futility of Petitioner's defense effort in light of the testimony of the surviving victim, the lack of any meaningful adversarial testing of the State's case magnified that testimony and permitted it to remain unchallenged.

instance, defense counsel was unable either to lay a proper foundation to predicate the particular question or offer a plausible explanation for the basis of the question to the trial judge to overcome the court's sustaining the State's objection.[9] Taken alone, no one instance establishes deficient representation. However, cumulatively, each failure underscores a fundamental lack of formulation and direction in presenting a coherent defense. Whether that amounts to a viable Sixth Amendment violation satisfying ***Strickland***'s two-pronged inquiry requires further evidentiary exploration to assure that hindsight has not distorted these examples, 466 U.S. at 689, or "sound trial strategy" has not unduly sheltered them.

We couple this concern over counsel's conduct in presenting a defense with their overall trial strategy, as Mr. Cantrell articulated in the Affidavit.

> Defense trial strategy as to the first stage of Case No. F-85-443 was to show the inconsistency of the evidentiary facts as alleged by the State. This was

---

[9]For example, Mr. Cantrell called Ann Cook, Petitioner's neighbor, to testify about a telephone conversation she had with Petitioner shortly before he left for Doug Ivens' house. She began to testify that Petitioner told her he had a telephone conversation with Doug Ivens and had discussed some insurance. Counsel then asked Ms. Cook, "Did he tell you whether or not Doug had asked him to come over to his house?" Prosecutor Bob Macy objected to the question as leading, and the court sustained the objection. Upon a second unsuccessful effort to ask the same question, Mr. Cantrell approached the bench and the court admonished him to ask direct, not leading questions. Mr. Cantrell then questioned Ms. Cook: "Do you know whether or not he told you that Doug had asked him to come over to his house?" Again an objection was sustained; the jury was dismissed; and Mr. Cantrell had another bench conference in which he asked the court's direction in phrasing the question. The court refused and after the jury returned, the court permitted co-counsel, Mr. James, to continue questioning Ms. Cook. The court sustained the prosecution's hearsay objection to Mr. James' questions about Ms. Cook's conversation with Petitioner.

primarily to be done through cross-examination of the State's witnesses and presentation of the State's imperical [sic] evidence in it's [sic] true light to the jury.

We offer one example from many in the record which defies this characterization and leaves us with a suspicion that defense counsel had not previously interviewed prosecution witnesses or prepared adequately for trial. In its case-in-chief, the State called Mr. James Gibbons, an officer in the Oklahoma City Police Department, who was on patrol the night of the murder and was directed to the crime scene, arriving just after the ambulance. In his direct testimony, Officer Gibbons described his duties at the crime scene and how, as one of the first officers there, he stepped over Mr. Ivens while ambulance workers were administering care, and looked over the house, spotting the gun on the sofa and moving it to avoid any further accidents. He then related how Mr. Ivens, lying gravely wounded on the floor, told him he'd been shot by Bud Stouffer. Officer Gibbons recalled Mr. Ivens added, "Stouffer like the frozen food kind."

Mr. Cantrell cross-examined, first questioning the officer about whether he had sketched the crime scene although his direct testimony made clear what his responsibilities were. Mr. Cantrell then asked the officer when he "interviewed" Doug Ivens, as the officer previously described, whether the victim was coherent:

A  Yes, sir.
Q  Do you think that he was in command of his mental senses, and knew what he was saying?
A  I believe so, yes, sir.
Q  And is it correct that you asked him who shot you, and that he said Bud?
A  Yes, sir.

- 17 -

Q  Is it also correct that you asked him Bud who, and he said "Stouffer, as in the frozen food."
A  Yes, sir.

Mr. Cantrell not only provided the jury with a second opportunity to hear Mr. Ivens' eyewitness identification but also established when the statements were made, the speaker, Petitioner's accuser, was coherent and in command of his senses.

In another instance, when cross-examining Ms. Chai Choi, the State's forensic pathologist, Mr. James meticulously asked questions about each bit of soot, hair, bone, and other material found on Ms. Reaves, eliciting responses already given in her direct testimony.  Counsel then suggested alternative theoretical possibilities for this physical evidence which again served to reiterate that evidence and underscore its validity without casting any doubt upon it.  Mr. James concluded by asking:

Q  Since you don't know which order the shots occurred, and everything, is it possible that wound that you have described in the left hand was received, hypothetically in the following manner:  That the lady put the hand up in front of her, she was shot through here, and then shot in the chest?
A  Yes, it's possible.
Q  It even could be probable, is that correct?
A  It may be.

Defense counsel's revisiting the picture of this third grade teacher whom the State sought to prove had been shot execution-style again belies Mr. Cantrell's statement counsel attempted to "show the inconsistency of the evidentiary facts."[6]

_____

[6]In cross-examining Officer Steve Pacheco, Mr. Cantrell had the witness draw in the blood spots, showing the locations and trails in the room.  Mr. Cantrell asked the officer to "make your blood in the wet bar a little bit bigger please"?  The witness

(continued...)

Finally, we would note closing arguments offered by both defense counsel. Mr. James led off by telling the jury he would not go over the entire case but rather address the testimony of the expert witnesses. Instead, he spoke generically about the jury's role, the State's burden, and raised some questions about why Ms. Reaves did not run out of the house when she heard the first shots; how her head was slumped; and why Petitioner would borrow a gun when he had access to one at Velva's house. A second time, he told the jury he had hardly been on the case longer than they: "Actually one week ago today is when I really started working on the case."

In tandem, Mr. Cantrell reviewed the State's theory of the shooting and key testimony introducing a new line of defense that the police misinvestigated the case, instantly targeting Petitioner and failing to explore other possibilities and suspects.[7] After that lengthy narration, Mr. Cantrell told the jury how the timing of this trial, beginning just before the fourth of July, prompted him to think about 209 years before and how the Declaration of Independence to which the signers pledged their lives was in such stark contrast to the sloppy way the State had presented its case. Pages later in the record after

---

[6](...continued)
complied.

[7]Mr. Cantrell: "And I ask you – and again, we see the consistent and the continual, and the thorough misinvestigation of this case. I asked him, I said weren't there two eye-witnesses to at least some incidents? He said why, no, there was only one. I said well, who was that? He said Doug Ivens. He was there. I said what about Bud Stouffer. He said oh, no, he was a suspect. You see? The consistent and continual complete absence of extensive and thorough investigation in this case."

the State objected, Mr. Cantrell proceeded to tell a last anecdote about a friend who served as Assistant Chief of Staff at the White House and the friend's experience with a group of African Freedom Fighters at the Jefferson Memorial to illustrate the jury's role in assuring a fair trial. Prosecutor Macy commenced his closing statement with an apology for the length of the closing arguments and promised he would not give any lessons in American history.

If defense counsel's trial strategy was to "show the inconsistency of the evidentiary facts," the record reveals the strategy served to reinforce the State's evidence without ever, except for Petitioner's isolated testimony, presenting a case in defense. Each key piece of defense evidence was thwarted by defense counsel's inability to advance it. This is not hindsight. These are the facts of defense counsel's performance at the time of a capital trial. To shelter these facts with the mantle of trial strategy defies experience, we believe, and countenances deficient practice in such a high-stakes setting.

Nonetheless, without benefit of an evidentiary hearing, our judgment of counsel's performance as deficient remains unsettled given the Court's admonition in *Strickland* to avoid the seduction of hindsight review. Moreover, it represents only half the analysis. We must determine whether the failure to provide Petitioner with objectively reasonable representation prejudiced the defense such that we cannot say the result is reliable. *Strickland*, 466 U.S. at 687. We focus that analysis by addressing the third prong of

Petitioner's ineffectiveness claim, the lack of mitigating evidence presented during the penalty phase of his trial.

## C. Mitigating Evidence

Petitioner contends counsel's failure to investigate, prepare, and present mitigating evidence not only demonstrated deficient representation but also clearly caused prejudice, denying him the prospect of the potential single juror who would not vote for the death penalty. He maintains counsel treated the penalty phase as "a mere afterthought," calling only one witness who raised for the first time the presence of a "personality disorder" of immaturity, which, in fact, contradicted the self-defense theory by attempting to offer some excuse for the murder.

Again, because there has been no evidentiary hearing in either the state or federal court, we look to Mr. Cantrell's Affidavit explaining his strategy at the penalty phase:

> It is the recollection of Chief Defense Counsel that the Defendant requested no witnesses to be called in the second stage other than Dr. Call.
> ....
> It was, and is, the opinion of Chief Defense Counsel that had character witnesses been called for the Defendant, such testimony would have made little or no impression of a positive nature upon the jury. Additionally, such a maneuver would have allowed the State to present evidence showing, in their opinion, the bad character of the Defendant. Had the State [sic] allowed, by the opening of the issue of character by the defense, to present refuting evidence of bad character it is the opinion of Chief Defense Counsel that the prejudice against the Defendant to the jury would have outweighed whatever possibly helpful evidence might have been presented to the jury on the issue of the Defendant's character.
> The Defendant did not want the evidence of Dr. Call concerning the Defendant's absolute imaturity [sic] placed into the record. It was, and is, the opinion of Chief Defense Counsel that Dr. Call's testimony was the only

- 21 -

qualified expert evidence that could be given in mitigation of the punishment to be assessed against the Defendant.

The Defendant did advise counsel that the Defendant believed that the Defendant had flunked Dr. Call's test. Upon inquiry to Dr. Call, Chief Defense Counsel was advised by Dr. Call that the test was of such a nature that the Defendant could not "flunk" the test. That is, the test measured psychological traits of the Defendant, not imperical [sic] knowledge.

It was the belief of the Chief Defense Counsel that Dr. Call's testimony would establish the Defendant's inability to emotionally or intellectually act or react beyond the level of an early adolescent child. This being the case, it was the belief of Chief Defense Counsel that in sentencing, the jury would determine that the punishment assessed against the Defendant would be commensurate to punishment leveled against an early adolescent child in similar circumstances. In short, it was believed that Dr. Call's testimony would incline the jury to assess a merciful punishment against the Defendant.

First, the Affidavit addresses counsel's decision not to call other witnesses to offer evidence in mitigation of Petitioner's sentence. Mr. Cantrell recalled Petitioner directed him not to do so although Petitioner contradicted that representation in a supplemental record accompanying his 1986 post-conviction petition. Attached to that filing were affidavits submitted by family members, business acquaintances, and friends describing Petitioner as a person of high morals, good judgment, and trustworthy character. However, Mr. Cantrell explained he did not place Petitioner's character in issue during the penalty phase to forestall the State's introducing evidence of bad character. The district court placed Mr. Cantrell's decision not to call additional witnesses "within counsel's strategic discretion," although it found "nothing in the record to suggest petitioner previously exhibited violent behavior." It further found Petitioner was not prejudiced by

the Oklahoma Court of Criminal Appeals' consideration of "an allegation of past violent behavior although no evidence of such behavior existed on the record."

Lurking behind the tactical decision not to place Petitioner's character at issue was a tape of a telephone call, apparently recorded at an Oklahoma City police station, in which the caller, in a rambling, free-associational manner, suggested Petitioner was involved in drugs, prostitution, and gambling. Although the state trial court ruled the tape inadmissable, calling it "rank hearsay," the tape remains with the record and serves as a persistent echo about Petitioner's "bad character."[8] Thus, on the basis of this nonentity in the record[9] and no representation from the State it had any evidence to offer of "bad character," Mr. Cantrell made the "tactical decision" not to call other witnesses. Moreover, Mr. Cantrell made no effort, at least as represented by the Affidavit, to investigate any mitigating evidence.

As a second area of concern, judging counsel's explanation at the time the decision was made, that is reconstructing "the circumstances of counsel's challenged conduct, and [] evaluat[ing] the conduct from counsel's perspective at the time," *Strickland*, 466 U.S. at 689, we are baffled by the reasonableness of Mr. Cantrell's proceeding with this one

---

[8]The Oklahoma Court of Criminal Appeals embraced the evidence as well, stating, "Had the defense made appellant's character an issue as such, the State *could have* presented significant evidence of appellant's connection to organized crime and of his prior violent conduct." *Stouffer I*, 738 P.2d 1349, 1362 (Okla. Crim. App. 1987) (italics added).

[9]At oral argument in this appeal, the State persisted in calling the tape "some indication in the record."

witness, against the wishes of his client, upon the belief that a jury that took less than an hour to find him guilty[10] would choose to spare his life because he behaved like an adolescent. Nothing in the guilt phase of the trial, incorporated into the penalty phase, indicated Petitioner behaved immaturely and impulsively. Indeed, Doug Ivens testified he relied upon Petitioner to negotiate with Velva to visit his daughters. Velva Ivens described the good relationship Petitioner enjoyed with her children. However, in closing, defense counsel did not reiterate any positive evidence about Petitioner. Instead, Mr. Cantrell apologized to the jury for appearing to zealously represent his client; did not attempt to revisit any positive character information from the trial's first phase; and did not underscore Petitioner's lack of a criminal record, or attempt to plead for Petitioner's life, other than to tell the jury he was almost a half century old so life imprisonment would not last an inordinately long time.

While the decision to present no mitigating evidence may be a tactical one, the failure to investigate the existence of any such evidence triggers a fundamental component of the Sixth Amendment.

> The duty to investigate derives from counsel's basic function, which is to make the adversarial testing process work in the particular case. Because that testing process generally will not function properly unless defense

---

[10]Mr. Cantrell stated in the Affidavit he did not give an opening statement in the penalty phase because "an opening statement would inflame the jury prejudicially against the Defendant and furnish the State's counsel with an opportunity to refute generally what the State could not otherwise refute specifically. In other words, Chief Defense Counsel wished to hold State's counsel to the narrow issue of Dr. Call's specific testimony and opinion. The Affiant believes that this was successfully accomplished."

counsel has done some investigation into the prosecution's case and into various defense strategies, [the Supreme Court has] noted that counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Williamson*, 110 F.3d at 1514 (quoting *Kimmelman v. Morrison,* 477 U.S. 365, 384 (1986)) (internal quotation marks omitted). We have frequently stated, "In a capital case the attorney's duty to investigate all possible lines of defense is strictly observed." *Duvall v. Reynolds*, 139 F.3d 768, 777 (10th Cir. 1998), *cert. denied*, 119 S. Ct. 345 (1998) (quoting *Coleman v. Brown*, 802 F.2d 1227, 1233 (10th Cir. 1986)). Although we have never delineated the bounds of that duty, *Brecheen v. Reynolds*, 41 F.3d 1343, 1366 (10th Cir. 1994), we have stated, "an attorney must have chosen not to present mitigating evidence after having investigated the defendant's background, and that choice must have been *reasonable* under the circumstances." *Id.* at 1369 (citations and internal quotation marks omitted).[11] Nonetheless, "[w]hat is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek v. Texas*, 428 U.S. 262, 276 (1976) (plurality opinion).

The introduction of mitigating evidence individualizes the capital sentencing decision. The Supreme Court has underscored every defendant's right to introduce mitigating evidence at capital sentencing because the death sentence is *"so profoundly different from all other penalties."* *Lockett v. Ohio*, 438 U.S. 586, 605 (1978) (plurality

---

[11]We would note *Brecheen v. Reynolds*, 41 F.3d 1343 (10th Cir. 1994), for example, was decided with benefit of an evidentiary hearing as were *Duvall v. Reynolds*, 139 F.3d 768 (10th Cir. 1998), and *Brewer v. Reynolds*, 51 F.3d 1519 (10th Cir. 1995).

opinion) (emphasis added). Thus, we must closely scrutinize counsel's performance to assure their representation appreciated the role of mitigating evidence in the second phase of Petitioner's trial. In this context, the objective reasonableness of counsel's performance is not assessed by the attorney's general legal skill, experience, and knowledge. "When the choice is between life and death," *id.*, we must demand more of counsel's representation to assure defendant "[t]hat a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command." *Strickland*, 466 U.S. at 685.

To establish entitlement to an evidentiary hearing under pre-AEDPA law, a petitioner must "make allegations which, if proved, would entitle him to relief." *Medina v. Barnes*, 71 F.3d 363, 366 (10th Cir. 1995) (citation omitted). "[W]here an applicant for a writ of habeas corpus alleges facts which, if proved, would entitle him to relief, the federal court to which the application is made has the power to receive evidence and try the facts anew." *Townsend v. Sain*, 372 U.S. 293, 312 (1963). When the facts are in dispute, the federal district court "must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding." *Id.* In this case, we believe Petitioner has alleged specific and particularized facts, which, if proved, would entitle him to relief. *Hatch v. State of Okla.*, 58 F.3d 1447, 1471 (10th Cir. 1995).

Nevertheless, before a hearing is mandated, we recognize Petitioner must also satisfy the second *Strickland* hurdle, whether he has been prejudiced by counsel's alleged ineffective assistance; that is, whether there is a reasonable probability that but for his attorneys' deficient representation, the result would have been different at the guilt and penalty stages. Again, given the state of this record before us, we cannot prognosticate. Absent an evidentiary hearing, we may only bandy the merits of the ineffective assistance claim about piecing together fragments and substituting conjecture for reasoning. Most importantly, because an ineffectiveness claim is a mixed question of fact and law, the adequacy of the record is essential. We therefore conclude the district court erred in failing to hold an evidentiary hearing to assess Petitioner's allegations of ineffective assistance of counsel as we have delineated that issue.

### III. State's Reweighing

After the Oklahoma Court of Criminal Appeals modified its denial of Petitioner's direct appeal by finding the evidence was insufficient to support a finding of the aggravating circumstance the murder was especially heinous, atrocious, or cruel, *Stouffer II*, 742 P.2d at 563, the court weighed the remaining aggravating circumstances. It considered the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution and the perpetrator knowingly created a great risk of death to more than one person, with the mitigating circumstances, the lack of a criminal record and personality disorder, and concluded "the sentence of death [was] factually substantiated

and appropriate." *Id.* at 564. The court further stated the "overwhelming evidence of guilt" rendered inclusion of the unsupported aggravator "at most harmless error." *Id.* Examining his federal habeas claim, the district court rejected Petitioner's argument that, despite its subsequent elimination, inclusion of the unconstitutional aggravating circumstance required vacating his sentence. Rather, it found the state court actually reweighed, "albeit described in a somewhat cursory fashion."

Here, Petitioner contests this conclusion, distinguishing that although the state court's reweighing was correct in form, *Clemons v. Mississippi*, 494 U.S. 738, 748-54 (1990), it lacked the essential substance mandated by *Richmond v. Lewis*, 506 U.S. 40, 48 (1992). He maintains the decision was too summary to permit any adequate independent review and remained infected by the pervasive taint of the especially heinous, atrocious, or cruel aggravating circumstance. He urges the Oklahoma Court of Criminal Appeals' terse conclusion failed to reveal whether it "actually reweighed" to cure the otherwise constitutionally infirm sentence.

Our de novo review of the decision reweighing the aggravating and mitigating factors must determine whether *Stouffer II* afforded Petitioner "an individualized and reliable sentencing determination based on the defendant's circumstances, his background, and the crime." *Clemons*, 494 U.S. at 749; *Stafford v. Saffle*, 34 F.3d 1557, 1569 (10th Cir. 1994). We are not required "to peer majestically over the [state] court's shoulder so that [we] might second-guess its interpretation of facts," *Lewis v. Jeffers,* 497 U.S. 764,

- 28 -

780-81 (1990) (quoting *Godfrey v. Georgia*, 446 U.S. 420, 450 (1980) (White, J., dissenting)), but rather, applying the standard used to review a conviction, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  The standard "is equally applicable in safeguarding the Eighth Amendment's bedrock guarantee against the arbitrary or capricious imposition of the death penalty."  *Lewis*, 497 U.S. at 782.  Thus, "[a]t a minimum, we must determine that the state court actually reweighed," *Richmond v. Lewis*, 506 U.S. at 48, so that the statutory aggravating circumstance provides "principled guidance," *id.* at 46, and not a "*conclusive* justification" for the death penalty, *id.* at 49.

In light of the state court's abbreviated reweighing, the district court sketched in those facts substantiating the appropriateness of the death sentence.  It cited the "ample evidence" Ms. Reaves was shot at close range to substantiate Petitioner knowingly created a great risk of harm to more than one person "regardless of any evidence presented to show the gruesome or heinous nature of the crime."  Further, the court stated, "the absolute lack of connection between petitioner and Reaves prior to the shooting meant that Reaves was only shot to preclude her later appearing as a witness against petitioner," as evidence in support of the second aggravating circumstance.

Nonetheless, Petitioner catalogs the numerous references in the State's closing argument, describing the killing as heinous, atrocious or cruel, or some closely connected adjectival equivalent. The prosecution's repeatedly characterizing defendant as pitiless, wicked, evil, greedy, cold-blooded, and unaffected by killing, however, Petitioner insists, illustrates how the presence of the heinous, atrocious or cruel aggravator fatally infected the process of arriving at a sentence.

"[T]he United States Supreme Court 'has never specified the degree of clarity with which a state appellant court must reweigh in order to cure an otherwise invalid death sentence.'" *Correll v. Stewart*, 137 F.3d 1404, 1418 (9th Cir. 1998) (quoting *Jeffers v. Lewis*, 38 F.3d 411, 414 (9th Cir. 1994)). Thus, the Court has not translated its call for "close appellate scrutiny of the import and effect of invalid aggravating factors," *Stringer v. Black*, 503 U.S. 222, 230 (1992), into a clear set of requirements for a constitutional reweighing analysis. However, in reviewing its analysis, we may look at the evidence before the Court of Criminal Appeals to support Petitioner's conviction.[12] That evidence included Doug Ivens' describing Petitioner's standing over him firing a last shot into his face and Ms. Reaves' exclaiming, "No," trying to shield herself from Petitioner's aim

---

[12]It remains, however, troubling in the interest of a comprehensive review and principles of comity for the state court to have provided such a scant acknowledgment of its review. Although we do not disagree with the State's assertion "[t]here are no magical terms which must be included in the reweighing determination," the state court's failure to even shorthand a conclusion based on its actual reweighing that with removal of the unsupported aggravator the jury would still have found ample evidence to support the remaining two aggravators, renders independent review more problematic.

before he shot her at close range. In arriving at a verdict of guilt in the first phase after only an hour's deliberation, we may infer the jury fully embraced the State's case and then rationally could channel that evidence to individualize its determination of the death sentence. Surely, a rational fact-finder viewing this evidence in the light most favorable to the State could find Petitioner's actions created a risk of death to more than one person, and he shot either Ms. Reaves or Mr. Ivens to escape detection. The Court of Criminal Appeals noted the trial court's advising the jury Petitioner's personality disorder and lack of a prior criminal conviction involving violence were minimum mitigating circumstances. *Stouffer II*, 742 P.2d at 564 n.4. Thus, we must conclude the two remaining aggravating circumstances clearly outweighed the mitigating evidence presented. While this balance may be affected by counsel's failure to investigate and present mitigating evidence of defendant's circumstances and background, *Clemons*, 494 U.S. at 749, within the scope of our review, we believe the sentencing jury was guided by the overwhelming evidence of guilt. *See Moore v. Reynolds*, 153 F.2d 1086, 1115 (10th Cir. 1998).[13]

## IV. Lesser Included Offense

Petitioner contends the trial court's instructing only on first-degree murder for the death of Ms. Reaves was plain error, foreclosing the jury from considering a verdict of guilt on a lesser-included non-capital offense which the evidence would have supported.

---

[13]In *Moore v. Reynolds*, 153 F.2d 1086 (10th Cir. 1998), however, the court had the benefit of a more detailed enumeration of the mitigating evidence to underpin the individualized determination "based on defendant's circumstances, his background, and the crime." *Clemons v. Mississippi*, 494 U.S. 738, 749 (1990).

He relies principally on *Beck v. Alabama*, 447 U.S. 625 (1980), which invalidated an Alabama statutory scheme prohibiting the judge from instructing the jury on the option of convicting defendant charged with a capital crime of a lesser included offense. Petitioner asserts because he steadfastly maintained he was only aware of the shots during the struggle with Mr. Ivens, the possibility two of those shots accidentally hit Ms. Reaves required the trial court to instruct the jury on second-degree murder, second-degree manslaughter, or negligent homicide under Oklahoma law. Acknowledging counsel did not request the lesser-included offense instructions, Petitioner urges the failure amounts to plain error.

The State counters by distinguishing *Beck* and underscoring Oklahoma law which provides a lesser included offense instruction should not be given unless there is evidence to support it. The State reminds the evidence portrayed either Petitioner's intentional deceit to obtain the gun he used to shoot Doug Ivens and Ms. Reaves or Iven's pulling the gun on Petitioner and the shootings resulting from the gun's accidentally discharging and stray bullets hitting unintended targets. That is, Petitioner's testimony left the jury no choice but to find him guilty of murder in the first degree or not guilty based on self-defense.

Denying this claim for relief, the district court found, based on either Mr. Ivens' or Petitioner's testimony, a rational jury could not have concluded Ms. Reaves was shot intentionally yet without premeditation. That is, Petitioner's testimony would not support

a finding of conduct evincing a depraved mind in extreme disregard of human life, an element of second degree murder; nor did any of the State's evidence support any inference but premeditated action intended to take a life. Rather, the district court found Petitioner only offered evidence leading to a complete defense of the murder charge. Under these circumstances, the court concluded the trial court's failure to instruct on second degree manslaughter or negligent homicide did not violate Petitioner's right to due process.

*Hopper v. Evans* clarified **Beck**, stating, "But due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction. 456 U.S. 605 (1982). The jury's discretion is thus channeled so that it may convict a defendant of any crime fairly supported by the evidence." *Id.* at 611. Thus, the Court rejected defendant's effort to confine his conduct to the commission of a robbery under Alabama law in light of his repeated statements making it "crystal clear" he killed and intended to kill the victim. *Id.* at 612.

Okla. Stat. Ann. tit. 21, § 701.7(A), states:

A person commits murder in the first degree when he unlawfully and with malice aforethought causes the death of another human being. Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof.

Okla. Stat. Ann. tit. 21, § 702, adds, "A design to effect death is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed,"

- 33 -

and under section 703, that design to effect death "may be formed instantly before committing the act by which it is carried into execution." Okla. Stat. Ann. tit. 21, § 703.

In contrast, Oklahoma classifies a homicide as murder in the second degree "[w]hen perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual." Okla. Stat. Ann. tit. 21, § 701.8(1).[14] Under Oklahoma law, first degree manslaughter is a homicide "perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide."

On redirect examination, Petitioner was unwavering in his story he shot Doug Ivens in self-defense: "[b]ecause I felt he had a gun in his hand, and I shot at the gun ... [and] I was scared to death." Despite his insistence he did not shoot Ms. Reaves, and his alternative explanation she may have been lying dead on the couch when he arrived or she was hit by ricocheting bullets, defense counsel failed to controvert the State's physical evidence.

---

[14]The Oklahoma Court of Criminal Appeals adopted a specific definition of depraved mind in *Palmer v. State*, 871 P.2d 429, 431 (Okla. Crim. App. 1994): "A person evinces a depraved mind when he engages in imminently dangerous conduct with contemptuous and reckless disregard of, and in total indifference to, the life and safety of another."

The question then becomes: if the jury disagreed with Petitioner's absolute defense of self-defense, was there evidence to support instructing it that Petitioner acted with a "depraved mind ... although without any premeditated design," § 701.8(1), or acted "in a heat of passion, but in a cruel and unusual manner to effect manslaughter in the first degree"? § 711(2). We think not. Petitioner introduced no evidence to support either potentially lesser included offense, a prerequisite under Oklahoma law. *See* ***Fowler v. State***, 779 P.2d 580, 585 (Okla. Crim. App. 1989). Moreover, "[a] state [] is not required to 'create a noncapital murder offense for every set of facts under which a murder may be committed.'" ***Duvall***, 139 F.3d at 786 (quoting ***Hatch***, 58 F.3d at 1454). We therefore conclude the district court did not err in denying Petitioner relief on this ground.

## V. Newly Discovered Evidence and Motion for Discovery

Petitioner's last two issues presented for this appeal are of recent vintage, raised for the first time in his federal habeas petition. He initially attempted to amend his federal habeas petition[15] with the claim he was incompetent to stand trial, relying on ***Cooper v. Oklahoma***, ___U.S. ____, 116 St. Ct. 1373 (1996), in which the Supreme Court invalidated an Oklahoma statute requiring defendant prove incompetence by clear and convincing evidence to overcome the presumption of competence. The district court,

---

[15]Petitioner also filed a pro se Motion for Abeyance to Exhaust State Proceedings, which informed the district court he was also seeking post-conviction relief in state court based on ***Cooper v. Oklahoma***, ___U.S. ____, 116 S. Ct. 1373 (1996). The Oklahoma Court of Criminal Appeals had instructed its clerk not to accept additional filings from Petitioner.

however, denied amendment, finding nothing in the record or subsequent to it to establish competency was ever an issue or any objections by defense counsel to any informal determinations about competency. Petitioner appealed the denial of his motion to amend in his notice of appeal filed June 12, 1997.

On August 6, 1997, Petitioner sought relief from judgment under Fed. R. Civ. P. 60(b), appending an affidavit from his trial counsel, Mr. Cantrell, which enumerated each instance of his effort to have the court recognize the need to assess Petitioner's competence. The affidavit concluded Petitioner was incompetent to assist in his defense because of his "adolescent mental and emotional maturity level." The district court denied that motion as well concluding it came too late and provided insufficient grounds excusing Petitioner's failure to present the affidavit earlier. Petitioner did not file a new notice of appeal although in this appeal he only addresses the denial of his Rule 60(b) motion.

Appellate counsel asserts the initial notice of appeal is sufficient to confer jurisdiction, relying on ***Hinton v. City of Elwood, Kan.***, 997 F.2d 774 (10th Cir. 1993). The State does not specifically respond. However, we are obligated to examine the basis of our jurisdiction before addressing the merits of Petitioner's claim.

The denial of a Rule 60(b) motion is separately appealable. Indeed, its denial usually "raises for review only the district court's order of denial and not the underlying judgment itself." ***Stubblefield v. Windsor Capital Group***, 74 F.3d 990, 994 (10th Cir. 1996). Consequently, absent his filing an amended notice of appeal or second notice of

appeal, we lack jurisdiction to consider Petitioner's claim the district court erred in failing

to grant relief from judgment so that he could present newly discovered evidence of his

competence to stand trial.[16]

In another pro se motion, Petitioner sought the release and transfer of certain

evidence for DNA testing: Petitioner's jacket and shirt worn at the crime scene; a dried

sample of Linda Reaves' blood; and the shirt Doug Ivens wore which was submitted to the

State's forensic expert but not admitted into evidence at trial. Petitioner's motion asserted

the evidence had been preserved and remained in the custody of the State. He alleged the

PCR and RFLP DNA testing, not available at the time of his trial, was necessary because it

could provide the essential evidence corroborating his version and contradicting the State's

forensic expert's testimony.

Dr. Joyce Gilchrist, the State's forensic serologist, testified there was not enough

blood on the shirt to produce a sample capable of being typed by conventional serological

methods. Although she believed there were blood stains on Petitioner's leather jacket,

---

[16]***Hinton v. City of Elwood, Kan.***, 997 F.2d 774 (10th Cir. 1993), is not to the contrary. There, we addressed whether plaintiff's untimely notice of appeal was validated by the district court's later approval of his subsequent motion to extend the time to file a notice of appeal. To resolve the question, we examined Fed. R. App. P. 4(a)(2) and 4(a)(4) and concluded, "these two provisions stand for the proposition that a premature notice of appeal retains its validity only when the order appealed from is likely to remain unchanged in both its form and its content. When an intervening motion occurs which could alter the order or judgment appealed from, a new notice of appeal must be filed after disposition of the subsequent motion to ensure that the would-be appellant still desires to appeal." ***Hinton***, 997 F.2d at 778. Petitioner surely sought to alter the judgment appealed from and was required to file a new notice of appeal.

those spots tested negative for human blood. She explained the result stating that blood is generally absorbed by leather. However, tests of the blood on Petitioner's shirt sleeve showed genetic markers consistent with Ms. Reaves' blood.

The district court denied the motion, finding Petitioner's allegations would not entitle him to relief on any ground raised. First, it noted that traditional serological techniques identified the blood on his sleeve to match Ms. Reaves' blood. Second, it faulted Petitioner's failure to identify a claim cognizable in habeas or any legal theory entitling him to relief, in particular, any connection between this DNA evidence and a claim of actual innocence.

Petitioner asserts the serologic evidence was crucial in corroborating Doug Ivens' version of events. However, he insists the results were inconclusive, necessitating retesting with the more sophisticated and advanced DNA techniques. This showing, he asserts, satisfied the "good cause" needed for discovery under Rule 6(a) of the Rules Governing Section 2254 cases[17] as recently articulated in ***Bracy v. Gramley***, ___U.S.___, 117 S. Ct.

---

[17]Rule 6(a) provides:

> **Leave of court required.** A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise. If necessary for effective utilization of discovery procedures, counsel shall be appointed by the judge for a petitioner who qualifies for the appointment of counsel under 18 U.S.C. § 3006A(g).

1793, 1799 (1997). He urges we find the district court abused its discretion in denying the motion.

We disagree. Petitioner's allegations fall far short of those relied upon in *Bracy*. There, petitioner sought habeas corpus relief claiming he was denied a fair trial because the trial judge was prosecution oriented in some cases to cover up the fact he took bribes from defendants in other cases. 117 S. Ct. at 1796. To prove his claim, petitioner sought discovery ranging from the transcript of the judge's own trial to copies of the judge's rulings to establish a pro-prosecution bias. The district court denied the motion for discovery and the Seventh Circuit affirmed. The Supreme Court reversed finding petitioner's showing established the trial judge's corruption in his own case not only with the judge's conviction but also with the additional specific allegations soundly rebutting the presumption that "public officials have properly discharged their official duties." 117 S. Ct. at 1799 (internal quotations omitted). Thus, the Court found those allegations amply entitled petitioner to conduct further discovery into his judicial bias claim. As the Court distinguished, the good cause showing under Rule 6(a) is targeted at discovery and is not meant to be judged by whether or not a petitioner would succeed on the merits of his claim. *Id.* We therefore hold the district court did not abuse its discretion in denying Petitioner's Rule 6(a) motion to perform further DNA testing.

### VI. Conclusion

Our review in this case is predicated on the awesome responsibility entrusted to the federal judiciary in its habeas jurisdiction. "Our duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." **Burger v. Kemp**, 483 U.S. 776, 785 (1987). Given that obligation, we **VACATE** the district court's order denying relief and **REMAND** for an evidentiary hearing addressing those concerns we have found deficient in the record. In all other respects, the district court's order is **AFFIRMED**.