Harold E. HOLMES, Jr., Petitioner,

v.

David R. MCKUNE, et
al., Respondents.

No. 97–3134–DES.

United States District Court,
D. Kansas.

Aug. 31, 2000.

Harold E. Holmes, Norton, KS, petitioner pro se.

Jared S. Maag, Office of Attorney General, Topeka, KS, for David R. McKune, respondent.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This is a petition for writ of habeas corpus, 28 U.S.C. § 2254, filed by an inmate of the Lansing Correctional Facility, Lansing, Kansas.

On June 21, 1979, petitioner Holmes was convicted by a jury in the District Court of Wyandotte County, Kansas, of rape, aggravated battery, and aggravated kidnaping. He was sentenced to life in prison and two terms of 5 to 20 years, all consecutive. The facts giving rise to these convictions are as follows.

## PROPOSED FINDINGS OF FACTS

The victim in this case testified that on August 21, 1978, she left her residence at

approximately 9:30 to 9:35 p.m. (T. at 74), and drove to a nearby junior high school parking lot and began to jog. Two black males approached and attacked her. She attempted to fight and strike at them to escape, but they brutally overcame her efforts. Each tried to rape her, and she testified that the taller assailant was successful. She was then thrown into a ditch and struck on the forehead with a gun or a club. As soon as the attackers were gone, she ran to a nearby home. The police were summoned and arrived at 10:48 p.m. (T. at 53). The sole issue at trial was identity of the assailant.

The victim identified Holmes at trial as the taller of the two assailants. However, her eyewitness identification of Holmes could be viewed as weakened on account of her prior inconsistent identification and failure to identify. *See United States v. McGuire*, 200 F.3d 668, 676 (10th Cir. 1999). Moreover, there was some confusion in her identification. Minutes after the attack, the victim described the taller of the two men as around 6 feet tall (T. at 55). She described the second man as 5 feet 8 to 5 feet 10 inches tall, with bushy hair. The day following the rape, the victim gave a 16-page statement to police (T. at 185). She stated that the taller of the attackers was around 5 feet 11 inches tall, a little taller than she at 5 feet 9 inches (T. at 187). At trial the victim testified that the taller male was close to 5 feet 9 or shorter after noting that defendant in the courtroom seemed no taller than 5 feet 9 inches (T. at 127).

Significantly, the victim failed at her first opportunity to identify Holmes as her assailant in a photo array eight days after the crimes. A police officer testified that he went to the victim's residence on August 29, 1978, to show her an array[1] of six photographs. Four of them were small ID photos of individuals obtained from the junior high school. The other two photos were larger mug shots each containing three different views. One of the mug shots was of defendant Holmes taken in June, 1978. The victim did not identify Holmes out of this photo array. Instead, she noted that other persons in the array "looked like" her assailants. The officer showing her the array testified that she thought the person in the other mug shot, Larry Kelly, "looked similar in height and everything to—looked like the tallest party that had raped her" (T. at 233). One of the small photos she found to look "something like" the smaller assailant. It was that of Willie Triplett, the main corroborating witness against Holmes (T. at 223–226). The victim testified at trial that she did not know why she was unable to identify Holmes in the first photo array (T. at 133). On cross-examination, defense counsel tried to question her about the photo array, but she could not remember anything about it.

On October 4, 1978, the victim identified Holmes out of a lineup[2] containing him and three other individuals (T. at 226–7). Holmes was dressed the same as he had been in the mug shot used in the photo array.

Holmes testified and has always maintained that he was playing frisbee with several boys in his neighborhood at the time the rape occurred. On October 6, 1978, police took Holmes' statement in which he named those boys. Petitioner's counsel did not interview or subpoena any of the named alibi witnesses.

On November 15, 1978, Willie Triplett gave a statement to police implicating Holmes. Triplett evidently informed police that Holmes had admitted to him that he committed the crimes.

Police detectives then took statements[3] from several of the individuals whom

---

1. This photo array (Trial Exhibit 37) is not among the records provided to this court.

2. The pictures taken of the line-up were exhibit 24 (T. at 117), and are not in the record provided to the court.

3. The statements given to police prior to trial

Holmes claimed he was with at the time of the attack (T. at 211–212). The State called three of Holmes' potential alibi witnesses to testify at trial.

The first was 16–year–old Robert Bailey. Robert testified that he went camping in the woods with defendant around 10:00 p.m. on the night of the rape. He further testified that a police car came by, he thought "somewhere" around 11:00 that night, to check on the fire they had built; and that he had been with defendant "at least a couple hours" prior to the visit by police (T. at 237). The prosecution pointed out that in his earlier written statement[4] to police, Robert had said the police came to the woods around 10:30 or 11:00 p.m., and that prior to their arrival he had been with Holmes "about an hour."

Defense counsel elicited some favorable testimony from this witness on cross-examination. He noted that Robert had also indicated in his statement that the boys took up a collection for marijuana at about 9:45 p.m., and that Holmes had been with them for around 15 minutes prior to that time, or since 9:30 p.m. (T. at 240). Robert said in his statement that he was not exactly sure of the time he met Holmes, but that he knew it was before 10:00 p.m. (T. at 241). Robert confirmed that they played frisbee in front of John Viens' house for a while before going into the woods, and that the same people mentioned by Holmes were with them. *Id.*

The State also called 18–year–old James Bailey. He testified that the night of the rape he was playing frisbee with Holmes and others prior to going to the woods (T. at 242). He had only gone to the woods after the police visit. The State then compared his trial testimony with his prior statement[5] where he said that he went to the woods, went home to get food, and then saw the guys playing frisbee. James responded that he saw Holmes and frisbee

playing before and after going to the woods (T. at 244–45).

Boal pointed out on cross-examination that detective Fiscus never asked James Bailey when he first saw Holmes (T. at 246).

The State called a third potential alibi witness: 16–year–old James Carmack. Carmack testified that he first saw Holmes the night of the rape in front of John Viens' house. He testified that the "only way I can remember" the time was "the streetlights were about to come on, kind of a pink color," when Holmes walked up (T. at 248). He testified that they played frisbee at Viens' house and then went to the woods. When asked what time the police came to the woods, he testified, "I really don't remember time exactly. I remember it was pretty late" (T. at 249). Carmack testified that he had been with Holmes about two hours prior to the time the police came to the camp (T. at 250). The State then compared his earlier statement[6] where he had estimated that the police came to the woods around 10:00 or 10:30 p.m., and that Holmes had been in his presence about an hour and a half prior to the arrival of the police (T. at 251).

On cross, Boal pointed out that Carmack did not have any particular reason to be watching the time, and had him repeat his observation that the street lights were just coming on when he first saw Holmes (T. at 252).

A dispatch card[7] recorded 12:14 a.m. as the time a patrol car actually arrived to investigate the camp fire (T. at 166).

The victim believed she had a good opportunity to observe the taller of her two assailants. She was a middle school art teacher who concentrated in human figures. She testified that she tried to memorize the taller assailant's face during the

by persons listed on the Notice of Alibi are not in the record provided to this court.

**4.** Admitted as Exhibit 38.

**5.** Admitted as Exhibit 33.

**6.** Admitted as Exhibit 34.

**7.** Apparently, defense counsel had not seen this exhibit prior to trial (T. at 168).

attack. She very confidently identified Holmes at trial as the taller assailant. She also admitted that her perceptions could have been affected by the trauma. Prior to viewing any photos of suspects, the victim had, on her own initiative, made a sketch[8] of the taller attacker intending to prevent herself from being confused by mug shots or working on a composite. The victim described her drawing as "an abstraction, a ... sort of simplified drawing" which she "didn't think anyone would understand." (T. at 110.) She then gave her opinion at trial that this drawing compared favorably to a photograph of defendant.

Defense counsel began to object that he had not seen the drawing or the photo (T. at 111), but ultimately must have disagreed with the artist's favorable comparison because he requested that her drawing be passed to the jury (T. at 124). In closing, he argued that the drawing could be practically anyone.

The victim's weakened eyewitness testimony was corroborated by the questionable testimony of Willie Triplett. The record discloses significant facts tending to impeach Triplett's credibility which defense counsel failed to present to the jury. In a hearing in chambers right before Willie Triplett was to testify for the State, it was revealed that his cousin Ricky Miller had been killed, and that Holmes had caused his death (T. at 255). Defense counsel asked only that Triplett be directed not to make comments regarding these facts on the ground that they might prejudice the jury[9].

It was also revealed in this hearing outside the presence of the jury that the State believed that the deceased Miller was the other attacker. Defense counsel indicated that he wished to ask Triplett about Miller's physical characteristics because he was "a much bigger person" than Holmes. Ricky Miller had lived with his cousin Willie Triplett. Triplett testified that Miller told him of his involvement in the crime along with Holmes. Defense counsel Boal mentioned in his closing argument that Miller was the other suspect. Boal did ask Triplett to describe Miller. He responded that Miller was about 6 feet 2 inches tall which was 5 inches taller than Holmes. This was indeed significant since the victim was unequivocal that Holmes was the larger of the two attackers. She had described the second as very thin, possibly a juvenile, and short with a bushy Afro. She had said in her statement to police that the bushy Afro of the smaller assailant was no higher than her eyes (T. at 188). Defense counsel Boal argued in closing that since Miller was significantly taller than Holmes, Holmes could only have been the smaller attacker. He also argued that Willie Triplett at 5 feet 4 (T. at 272), with bushy hair who was even noted by the victim in the first photo array as similar to the smaller assailant, better fit the description of the second attacker.

The prosecutor stated in his closing remarks that Willie Triplett had no reason to lie. Even the trial judge seemed unaware that Triplett might have an incentive for deceit[10]. When Triplett was admonished by the court in chambers not to discuss Holmes' involvement in the death of Miller, the court implied that Miller had died after Triplett gave his statement implicating Holmes and Miller. In actuality, Miller died only a few days before Triplett

---

8. This drawing was Trial Exhibit 26. It is not part of the record provided to this court.

9. While this was clearly a tactical decision by defense counsel, a pretrial motion in limine and hearing might have allowed some of the impeaching evidence against this important witness to be presented to the jury.

10. Holmes alleges in his pleadings that Triplett and Miller were his enemies with whom

he had had past physical altercations, and that Miller's death resulted from his defending himself during a confrontation. Apparently, Holmes was charged with manslaughter of Miller, but the charges were dismissed. Holmes alleges that Triplett lied in his statement to police and his trial testimony to retaliate for the death of his cousin.

decided to give incriminating information against Holmes to police.

Willie Triplett, 16 years old, then testified that he saw Holmes around 8:00 p.m. the night of the rape, walking near Frank Harvey's house while he was there with Frank and Ricky Miller. He testified that it was dark at the time [11]. He stated that when Frank and he left to run an errand, Miller and Holmes walked up the street together. He further testified that after he and Frank returned around 9:30 or 10:00 p.m., his cousin Miller told him that Holmes and he had committed the attack. Triplett stated that he then telephoned Holmes who came over about three minutes later; and that he, his cousin Ricky and Holmes talked about the crimes. He testified that Holmes told him he hit the victim over the head and they picked her up and threw her into the woods. He testified that Holmes told him he had showered and changed his bloody clothes and that he had an alibi [12] because the cops would probably question him. Triplett testified on cross that he had called Holmes about 10:00 p.m. Thus, Triplett said that he, Miller and Holmes were talking at 10:45 p.m.[13] the night of the rape. Triplett also testified that Holmes again admitted that he was one of the assailants a week later during a conversation with Triplett, Miller and Frank Harvey present.

Triplett's statement [14] given to detectives was dated November 15, 1978. The statement was the first time Triplett had revealed his conversations with Holmes to anyone (T. at 270). On cross, Boal asked if Triplett had said anything prior to his cousin being killed, and he answered that he had not (T. at 270). However, Boal never asked any questions of Triplett or Holmes regarding their feud.

Frank Harvey, 15 years old, was then called by the State. He testified that he had not seen Holmes the night of the rape incident, even though Triplett had testified he was with Harvey when he first saw Holmes that evening (T. at 278). Harvey also testified that a week later he was with Holmes, Miller, and Triplett, when he asked Miller if he had committed the rape, and Miller said "yeah." (T. at 279.) Harvey had told a detective about this conversation (T. at 283) after Triplett had advised him to question Harvey. Harvey testified at trial only that he had heard Holmes was involved, not that Holmes admitted his involvement to him (T. at 282). He did not recall from whom he had heard of Holmes' involvement. However, the detective who questioned Harvey during the investigation testified that Harvey had told him that he heard Holmes admit the crimes (T. at 285), but had refused to give a written statement.

The only witness called for the defense was the defendant. His testimony, and thus all of the defendant's evidence, takes 12 pages of the 361–page transcript. Boal had waived his opening statement (T. at 14). Holmes testified that he played frisbee in front of John Viens' house with several friends, namely Jake and Danny Carmack, Neil and Scott Phelps, John Viens, and Bobby and Jim Bailey. Viens' house was near defendant's. Holmes testified that he began playing frisbee around 8:30 or 9:00 p.m., just before dark. He stated that he played frisbee for one and a half to two hours, that Carmack then asked if he wanted to spend the night in the woods, that the boys pooled money to buy marijuana, and that he accompanied one or more of the boys to various homes to get permission and supplies, after which they went to the woods. He further testified that they gathered wood and built a

---

**11.** It is unlikely that it was dark at 8:00 p.m. on August 21.

**12.** Contrary to allegations in the Answer and Return (Doc. 14 at 6), the transcript does not contain testimony from Triplett that Holmes asked him to fabricate an alibi.

**13.** This obviously conflicts with the testimony of other State's witnesses that defendant was with them around 10:30 p.m.

**14.** Willie Triplett's prior statement was not admitted.

fire, which police came to check on around midnight.

Holmes denied that he had any conversation or contact with Willie Triplett that evening. He reiterated that he was never out of the company of at least some of the boys he played frisbee with that night. When the prosecutor cross-examined him, he stated that Willie Triplett was lying, and the victim was mistaken (T. at 314).

Boal did not redirect any questions to Holmes and did not call any other witnesses.

## FIRST 60–1507 HEARING (1983)

Petitioner did not raise the claims presented here on direct appeal [15]. At petitioner's first 60–1507 hearing, he claimed ineffective assistance of counsel for failure to interview and call witnesses and to object to hypnosis testimony. Trial defense counsel Boal was called as a witness. The trial had been over four years earlier. Boal did not bring or review his case file and could not answer any questions concerning the case with certainty [16]. For example, Boal thought he had been retained by defendant, but Holmes was certain that Boal had been appointed [17].

Testimony indicated that Boal did file a pretrial Notice [18] that an alibi defense would be utilized. (HC1 at 11). Boal testified that he never talked to any of the alibi witnesses listed in the notice either in person or by phone. (HC1 at 22). One of Boal's excuses for not interviewing the alibi witnesses was:

"Mr. Holmes made at least three appointments with me to bring witnesses to my office for the purpose of interview. The most recent prior to the time of

trial was the very Friday afternoon before the trial was to commence."

Not only did Mr. Holmes not bring any witnesses to my office at that time, he himself did not appear and left no message, sent no word, as to the cause of his absence.

(HC1 at 12–13). Boal admitted that he relied upon Holmes to get all his own witnesses (HC1 at 19). At the time Holmes was arrested, he was 18 and had completed ninth grade.

Boal's other excuse was that:

... the witnesses had given statements to police. And I had read those statements and I was fully aware of what it was they were going to say anyway....

*Id.* Boal further testified that

"Mr. Holmes' ... recitation to me as to what these witnesses would say and what they eventually said were two very different things...."

(HC1 at 20.) Boal said he thus became "somewhat disenamored with the quality of his (Holmes') alibi defense." (HC1 at 25.) Thus, Boal did rely on an alibi defense but did not interview or call any named witnesses who might have substantiated defendant's claim of alibi.

In his closing argument at trial, defense counsel Boal referred to the testimony of the three boys on the Notice of Alibi who were called as witnesses by the State as supportive of his client's alibi defense. He noted that they had no reason to lie. Yet, in this 60–1507 proceeding, he implied that he had not called the alibi witnesses because their testimony would not support the defense.

---

**15.** The unpublished opinion affirming petitioner's conviction on direct appeal is not among the records provided to this court. Case No. 51,723 (KS.Sup.Ct., Nov. 1, 1980). Briefs indicate that insufficiency of the evidence was the principal contention.

**16.** The judge asked Boal to review his case file after he left the 60–1507 proceeding and notify the court if there was "any material in the file that either changes or adds to the evidence in this case...." (HC1 at 40.)

**17.** Apparently, Boal was representing Holmes on the manslaughter charge resulting from Miller's death, when the court asked him to represent Holmes in the rape case as well.

**18.** It was stated at the hearing that a Kansas statute required seven days notice if the defendant wished to present alibi testimony other than his own (HC1 at 123).

Holmes testified at this hearing that he first met Boal in court when he was charged with voluntary manslaughter in the death of Ricky Miller (HC1 at 56). He then met with Boal once on the manslaughter charge in the county jail. With respect to the rape charges, he testified that he first talked with Boal at the time Boal agreed to represent him. *Id.* He said he informed Boal then that when police questioned and arrested him, he had stated that he had been near his home with friends playing frisbee (HC1 at 57). He told Boal at that time the names of these friends and his mother. *Id.*

Holmes was in jail on the manslaughter charge until March 19. The rape trial began June 18. Holmes testified that after he was released from jail and at least a month before trial, he stopped by Boal's office at Boal's request, but Boal was not there; and that he left with the secretary a list of the potential alibi witnesses' names and their known addresses. He then called Boal a couple days later, talked with him briefly, and Boal asked him to have the alibi witnesses contact him. Holmes testified that he informed Boal that he was no longer staying at his mother's house due to friction between Ricky Miller's relatives and him, so he was not near the neighborhood friends who could be alibi witnesses, and that he could not get a ride there. Holmes then testified that he had no further contact prior to trial in person or by phone with Boal (HC1 at 60). He said he knew to show up for trial because he received a summons telling him the trial date. He thought when he got the summons and saw that some of the alibi witnesses were being called by the State that it might be improper for him to contact them. He never contacted any of the potential alibi witnesses prior to trial.

Holmes also testified at this hearing, that he and Willie Triplett had a "violent feud" going on even before he killed Ricky

Miller; and that Triplett had made numerous threats against his life (HC1 at 71). He said he told his attorney that Triplett's statement to police claiming Holmes confessed to him was an intentional, retaliatory lie. *Id.*

Holmes' mother testified at this hearing. She said she was told by defense counsel Boal that she could not remain in the courtroom because she might be needed as a witness. She did not remember talking to Boal about her possible testimony. Boal testified that he thought he, defendant and Mrs. Holmes had decided prior to trial that she would not be called. Mrs. Holmes testified that she did remember the night of the incident and that she knew her son's whereabouts starting around 6 to 8 p.m. until 10 p.m. on that evening because she was "looking out the window every so often," "keeping an eye on him." (HC1 at 44, 50–51.) She did not recall telling the police this information. She stated that she was available and willing to testify throughout the trial (HC1 at 46). Of course, the alibi testimony of a mother is not as convincing as that of a non-family witness.

Neil Phelps White, an alibi witness Holmes had named who was not called at trial [19], testified at this 60–1507 hearing. He lived about five houses from Holmes in 1979. He testified that he was never contacted by anyone to be a witness in the trial, even though he had given a statement at the same time as his brother, Danny, and Jake (HC1 at 94). He further testified that Holmes was with him, Scott, Jake, Danny, and John "about all afternoon" walking around the neighborhood and playing frisbee up until 10:00 or 10:30 p.m. (HC1 at 97.)

The trial judge presided over this postconviction hearing. He emphasized that Holmes never objected at trial about Boal or suggested that his mother should be called as a witness during the numerous

**19.** He testified that Holmes had opportunities to ask him to testify as an alibi witness at his trial, but never did so (HC1 at 103).

times they were in chambers (HC1 at 67). Holmes responded that there were no "in chambers" hearings during the defense case, and that he was unaware that Boal was not going to call any other witnesses until after he had finished testifying (HC1 at 69).

Holmes further testified during this hearing, that he tried to persuade his attorney to do certain things but his attorney, the prosecutor and the judge either ignored him or told him he was behaving inappropriately. The trial judge hearing the matter said that he simply did not believe this testimony by Holmes and again faulted Holmes for not raising his ineffective assistance of counsel claims at the time of trial "where something could have been done about it if there was anything wrong." (HC1 at 120.) The judge further stated at the close of the hearing that "Mr. Boal had a right to rely on the statements of Mr. Holmes that he would assist him in this matter", and that "Holmes had an obligation to assist ..." (HC1 at 129.) The court apparently found the hypnosis evidence harmless on the ground that there was no indication during trial that defendant was called "Gene".

The State argued at this hearing that "it was evident to anybody" who read the statements of the Baileys and James Carmack that they didn't see Holmes until after the rape occurred and that it "was obvious that the first three witnesses that were listed were contradicting" what Holmes said in his statement to police. Respondents allege in the Answer and Return that the testimony of three of Holmes' listed alibi witnesses "established that petitioner had been in their company from roughly 10:30 p.m. onward, significantly later than the 9:00 to 9:35 p.m. time frame during which the rape occurred." (Doc. 14 at 5.) Throughout the state proceedings including during closing arguments and in briefs, the testimony of these three witnesses is characterized as supportive of the prosecution or conflicting with Holmes' account. This court finds from its reading of the trial transcript that this characterization is not supported by the record. Instead, the testimony of these three witnesses could at most be characterized as inconclusive and could even accurately be construed as supportive of Holmes' alibi defense.

When Holmes was asked at the 60–1507 hearing if he disagreed with the testimony of his listed alibi witnesses called by the State or if he thought they lied, he said, "No, I did not," and that he was in "full agreement" with their trial testimony (HC1 at 82). The four witnesses who have given testimony each confirmed being with Holmes on that evening very near or at the time of the crimes, playing frisbee, and camping in the woods as he claimed. These witnesses could not pinpoint the time they began playing frisbee with Holmes on that evening or how long they were playing. The testimony was that they had no reason to and did not know exact times. One's testimony was clearly that Holmes joined the group prior to the time the rape occurred just as street lights were coming on.

This court has not been provided with the state court file of the criminal proceeding. It was before the first 60–1507 court (HC1 at 79). As noted, the statements given to police by the potential alibi witnesses and other significant exhibits are not in the record provided by the State in response to this court's show cause order. The judge at the 60–1507 hearing on ineffective assistance of counsel had not read the statements (HC1 at 118). If an evidentiary hearing were required in this case, the court would order the State to produce all such evidence which was viewed by the jury.

It is clear that the potential alibi witnesses who were made known to defense counsel were never skillfully questioned by the defense attorney to discern if they could in some way better recall or establish the time they first saw Holmes and how long they actually were with him. The jury may have viewed testimony of the three who were called only by the State as favorable to the State for the very

reason that they were called by the prosecutor and not the defense. The record indicates that the State established, at most, that three of the eight or nine potential alibi witnesses called could not recall with certainty what time they first saw Holmes and how long they were with him prior to the recorded time that police officers checked on their camp fire.

**SECOND 60–1507 HEARING (1992)**

At a brief, second 60–1507 hearing on May 5, 1992, Holmes was represented by new counsel and was present. Counsel for Holmes stated that he had two claims. One, that the judge in the prior 60–1507 proceeding exhibited a racial bias which rendered that hearing unfair. In support of this claim, petitioner argued that the trial judge held his white defense counsel to a lesser duty "to go wherever witnesses may be ... and interview those witnesses," because Holmes is black. (HC2 at 11.) His second claim was that under case law decided after the trial, the admissibility of the testimony regarding the victim's memory being refreshed by hypnosis should have been but was not determined in a pretrial hearing (HC2 at 13).

The Wyandotte County trial judge after hearing the first 60–1507 motion, had made an equivocal remark. Finding that Holmes had failed to assist defense counsel, he stated: "It is somewhat difficult ... in our community, for a white lawyer to go into a black community and try to find witnesses without some assistance." (HC1 at 129). The attorney for Holmes and Holmes immediately responded that it was a white community in which the Holmes were the only black family. *Id.* Petitioner argues that Judge Cook's comment is evidence that limits were applied to his white attorney's obligation to assist a black defendant, which would not have existed if the client were white. He argues that the duty to investigate must be the same regardless of race.

The judge hearing this second 60–1507 motion concluded that this comment by Judge Cook did not "indicate any kind of a racial bias or prejudice on the part of Judge Cook." Without finding any facts or citing any other part of the record, the judge found:

> "It's simply his statement that it's difficult for a lawyer sometimes to do his job. But that doesn't indicate that he felt that a white lawyer has any less obligation to represent a black defendant as he does when he's representing a white defendant."

(HC2 at 40.)

The judge agreed with the finding of the appeals court on the prior 60–1507 that the testimony about hypnosis of the victim was exculpatory and therefore harmless (HC2 at 44), presumably because the names recalled by the victim were "Gene" and "Jerry" while defendant's name is Harold.

**STATE APPELLATE COURTS**

Holmes appealed the denial of both state habeas petitions to the Kansas Court of Appeals. On appeal of his first 60–1507, the KCOA issued an unpublished opinion on May 10, 1984 (Case No. 55,993). As to petitioner's claim that counsel was ineffective for failing to object to hypnosis testimony, the court found that there was no evidence presented at trial or at the first 60–1507 hearing that Holmes was called "Gene." The court stated: "Since the results of the hypnosis were ambiguous and could arguably have been believed to be exculpatory, a successful objection by counsel could have led the jury to believe that the suppressed results were more incriminating than they actually were." The court concluded that the decision not to object "may well have been a strategic decision which cannot be used to sustain a claim for ineffective assistance of counsel."

With regard to Holmes' claim that his trial counsel was ineffective for failing to interview or call alibi witnesses, the court found from Boal's testimony at the 60–1507 hearing, that his failure to call Mrs. Holmes and other alleged alibi witnesses "can well be considered part of reasonable defense strategy." The Kansas Supreme

Court summarily denied a Petition for Review on June 25, 1984 (Doc. 1 at 8).

The Kansas Court of Appeals issued an unpublished opinion affirming the denial of Holmes' second 60–1507 motion. Case No. 68,710 (July 30, 1993). With regard to Judge Cook's comment, the KCOA construed it as placing on petitioner "some burden of assisting his counsel in locating witnesses," (at *4) but not as applying a lesser burden on trial counsel. They also noted that Holmes was precluded from raising this issue in the second 60–1507 because he failed to object to the comment at the 1983 hearing and appeal, and that it was an attempt to relitigate the ineffective assistance of counsel claim. The court stated that there "is nothing in the record to indicate the trial court's 1983 decision was affected by the race of petitioner or his attorney," (at *8); and that the issue of counsel's effectiveness would not be reconsidered under this "guise."

The KCOA also held that the claim counsel was ineffective for failing to object to hypnosis evidence would not be reconsidered. They said that in the second motion Holmes claimed the testimony by a detective relating what the victim recalled under hypnosis violated his Sixth Amendment right to confront the witnesses against him. The court cited and discussed *State v. Haislip*, 237 Kan. 461, 701 P.2d 909 (Kan.1985), decided after the first 1507 motion. They held that the issue was properly raised, but that the rule from *Haislip* was an evidentiary rule and not one grounded upon a constitutional right. They also noted that the testimony was exculpatory and any error was harmless.

## CLAIMS

In the petition before this court, Holmes claims (1) that his trial counsel was ineffective because he failed to adequately investigate Holmes' alibi defense and to interview and call any of his alibi witnesses, (2) that his counsel was ineffective in failing to object to the improper admission of testimony regarding hypnosis of the victim, and (3) that his defense counsel was held to a lesser standard by the trial judge due to racial bias.

## STANDARDS

This petition is to be determined by the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under the AEDPA, a habeas claim may be granted only if state court proceedings:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d); *see also Hooks v. Ward*, 184 F.3d 1206, 1213 (10th Cir.1999); *Trice v. Ward*, 196 F.3d 1151, 1159 (10th Cir.1999).

 The Sixth Amendment guarantees criminal defendants the right of effective assistance of counsel. The Supreme Court has devised a two-step inquiry to determine whether a lawyer's poor performance has deprived an accused of his Sixth Amendment right to assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Stated succinctly, to establish an ineffective assistance of counsel claim, the petitioner must show (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced [his] defense." *Id.* at 687, 104 S.Ct. 2052. More specifically, Holmes must demonstrate his counsel "committed serious errors in light of 'prevailing professional norms'" such that his legal representation fell below an objective standard of reasonableness. *Foster v. Ward*, 182 F.3d 1177, 1184 (10th Cir.1999); *United States v. Haddock*, 12 F.3d 950, 955 (10th Cir.1993) (*quoting Strickland v. Washington*, 466 U.S. at 688, 104 S.Ct. 2052); *see also United States v. Carr*, 80 F.3d 413, 417 (10th Cir.1996). Prejudice is shown where there is "a 'reasonable probability' that the out-

come would have been different had those errors not occurred." *Foster,* 182 F.3d at 1184; *Haddock,* 12 F.3d at 955 (*quoting Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). The performance and prejudice components may be addressed in any order, and the court need not address both if Holmes fails to make a sufficient showing of either. *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069. The essence of an ineffective assistance claim is that counsel's errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect. *Kimmelman v. Morrison,* 477 U.S. 365, 374, 106 S.Ct. 2574, 2582, 91 L.Ed.2d 305 (1986).

■ In addition to creating the two-prong test in *Strickland,* the Court established general guidelines for evaluating ineffective assistance of counsel claims. Judicial scrutiny of counsel's performance should be done in a "highly deferential" manner that "eliminate[s] the distorting effects of hindsight," and starts with the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689–90, 104 S.Ct. at 2065; *Stouffer v. Reynolds,* 168 F.3d 1155, 1162 (10th Cir.1999). A "wide swath of that conduct is cut for sound trial strategy." *Id.* The court is to determine the objective reasonableness of counsel's performance, looking at the facts of the case at the time of counsel's conduct. *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066.

■■ In a federal habeas challenge to a state criminal conviction, a state court's conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court because it is "a mixed question of law and fact." *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070; *Foster,* 182 F.3d at 1184; *Williamson v. Ward,* 110 F.3d 1508, 1513 (10th Cir.1997); *see also Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Griffin v. Warden,* 970 F.2d 1355, 1357 (4th Cir. 1992). But the subsidiary factual findings by the state court in the course of deciding an effectiveness claim are entitled to the presumption under § 2254(e)(1). *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070; *See Trice v. Ward,* 196 F.3d at 1169. In any event, state court findings of fact are not entitled to deference where there has been an unreasonable determination of those facts in light of the evidence presented in the state court proceeding. 28 U.S.C. 2254(d)(2).

■ Holmes is not precluded from habeas review by his failure to raise his ineffective assistance of counsel claim at trial, as suggested by the trial judge at the first 60–1507 proceeding. Since collateral review is frequently the only means through which an accused can effectuate the right to counsel, the litigation of Sixth Amendment claims is not restricted to trial and direct review. *Kimmelman,* 477 U.S. at 378, 106 S.Ct. at 2584.

■ The Sixth Amendment requires that counsel "make reasonable investigations or make reasonable decisions that particular investigations are unnecessary." *Romero v. Tansy,* 46 F.3d 1024, 1029 (10th Cir.) *cert. denied,* 515 U.S. 1148, 115 S.Ct. 2591, 132 L.Ed.2d 839 (1995), *citing United States v. Soto Hernandez,* 849 F.2d 1325, 1329 (10th Cir.1988). This is true regarding alibi evidence. *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066; *Coleman v. Brown,* 802 F.2d 1227, 1233 (10th Cir. 1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987). Counsel's failure to investigate, particularly for purposes of an alibi defense, may render his performance constitutionally inadequate. *Romero,* 46 F.3d at 1029, *citing Kimmelman v. Morrison,* 477 U.S. at 384, 106 S.Ct. 2574, 91 L.Ed.2d 305. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable...." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.*

Whether counsel's failure to investigate a possible defense was reasonable "may be determined or substantially influenced by the defendant's own statements or actions." *Id.* at 691, 104 S.Ct. at 2066.

■ It may be assumed that it is unreasonable for defense counsel not to attempt to contact alibi witnesses to ascertain whether their testimony would aid the defense. *Foster,* 182 F.3d at 1184. In fact, when counsel fails to investigate a defendant's case for purposes of an alibi defense, habeas courts have routinely found the failure constitutionally deficient. *See Id.* at 1196 (dissenting opinion and cases cited therein). Even the Kansas Court of Appeals which denied petitioner's state claims, held in 1997 that a defense attorney's failure to contact the alibi witnesses, whose names defendant had given him, was not reasonable. *State v. Sanford,* 948 P.2d 1135 (Kan.App.1997).

■ In addition, counsel has a duty to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution. *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065.

■ Turning to the prejudice prong of the *Strickland* test: "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland, Id.* at 691, 104 S.Ct. at 2066. The test for evaluating the prejudice component is whether there is a reasonable probability that counsel's errors affected the outcome of the trial.

■ Generally, a habeas petitioner cannot meet his burden under the prejudice prong of *Strickland* "without a comprehensive showing as to what the investigation would have produced." The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming its admissibility in court, would have produced a different result. Under usual circumstances, such informa-

tion would be presented to the habeas court through the testimony of the potential witnesses. *Montgomery,* 846 F.2d at 415. To establish prejudice Holmes must demonstrate a reasonable probability that, but for his counsel's failure to interview and call alibi witnesses, there is a reasonable probability that he would have been acquitted. *Foster,* at 1184; *see Strickland,* 466 U.S. at 687, 694, 104 S.Ct. at 2064, 2068; *Lawrence v. Armontrout,* 31 F.3d 662, 667–68 (8th Cir.1994). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. A petitioner "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693, 104 S.Ct. at 2068. There is no per se rule. Each case regarding the failure to produce available alibi testimony is decided on its own unique set of facts.

■ In making its determination, "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* at 695, 104 S.Ct. at 2069; *Kimmelman v. Morrison,* 477 U.S. at 381, 106 S.Ct. at 2586. The adequacy of a pretrial investigation turns on the complexity of the case and trial strategy. *Code v. Montgomery,* 799 F.2d 1481, 1483 (11th Cir.1986). In order to determine if particular testimony might reasonably have led to a different result at trial, as *Strickland* requires, the district court must consider the strength of the offered testimony relative to the strength of the State's case. *Lawrence,* 31 F.3d at 667. The court must follow this instruction from *Strickland:*

> Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069; *Lawrence,* 31 F.3d at 668. The role

of a federal court considering a habeas petition is not to predict the hypothetical outcome of a future trial. *Lawrence*, 31 F.3d at 668. The court has examined petitioner's claims with these standards in mind.

## DISCUSSION

### HYPNOSIS EVIDENCE

 Petitioner argues that the evidence regarding hypnosis of the victim and names she recalled should not have been admitted because there were no procedural safeguards employed to reduce the risks associated with the use of such evidence. Defense counsel Boal testified at the first 60–1507 proceeding that he felt the testimony was exculpatory and that he was unaware that the defendant's nickname is Gene. The state courts denied petitioner's claims with regard to this evidence by concluding that it was exculpatory and therefore not prejudicial. This conclusion as the basis for the state court's decision is not supported by the record.

The facts material to this claim gleaned from the transcripts are that the victim testified at trial that the smaller male attacker called the taller one by a name which she could not remember. On August 28, 1978, the victim was hypnotized[20] at the police station for the purpose of assisting her to recall. She testified at trial that she had been hypnotized but still did not recall the name (T. at 116). Detective Fiscus testified that he was present at the police station when the victim was hypnotized by a doctor. The prosecution asked Fiscus if the victim had remembered any names during the hypnosis. He answered that she mentioned the names "Gene" and "Jerry" (T. at 191–92). Soon after the names disclosed under hypnosis were put into evidence, the prosecutor referred to defendant by his full name— Harold Eugene Holmes (T. at 193). He also had the witness read defendant's

statement which referred to the defendant by his full name (T. at 201).

In closing, the prosecutor recalled the evidence that the victim was hypnotized "in an attempt to trigger her memory about a name that was mentioned ..." during the attack (T. at 327). He reminded the jury that the name "Gene" or "Jerry" surfaced. The prosecutor queried whether this was significant and then told the jury to remember that the defendant's full name is Harold Eugene Holmes, Jr.

The State court's findings that this evidence was exculpatory appear to be based on erroneous statements in briefs and during arguments by the State that there was no mention of Holmes' middle name and even that the victim never testified she was hypnotized. These statements are refuted by the record. However, petitioner's claim regarding admission of evidence of hypnosis does not rise to the level of a constitutional violation so as to entitle him to federal habeas corpus relief. Nonetheless, the fact that defense counsel did not know of this evidence or its significance or object to its use, supports petitioner's claim of ineffective assistance of counsel.

### INEFFECTIVE ASSISTANCE OF COUNSEL

 At least one state court excused Boal's failure to interview alibi witnesses by interpreting it as a tactical decision. However, where as here, Boal did not even talk to the potential witnesses or discuss the matter with his client, it is difficult to presume that he made a strategic decision not to call them. Since alibi was Holmes' only defense, counsel's failure to interview potential witnesses may not, without some factual basis, be considered a tactical decision entitled to deference. *See Foster*, 182 F.3d at 1195–96 (Seymour, dissenting opinion); [Counsel's failure to communicate with or produce witnesses because the accused had "agreed" to obtain them himself,

---

**20.** At the first 60–1507 hearing, Boal was asked when he first became aware that testimony about hypnosis of the victim would be introduced. He did not recall (HC2 at 27).

There is no indication in the record before the court that he was aware of the hypnosis prior to trial.

amounted to a denial of effective assistance of counsel. *Bell v. Georgia,* 554 F.2d 1360 (5th Cir.1977) ]; [Counsel was ineffective for failing to investigate and interview alibi witnesses made known to counsel three days before trial. *Bryant v. Scott,* 28 F.3d 1411, 1419 (5th Cir.1994) ].

While Boal said he read statements taken by police which "disenamored" him of Holmes' alibi defense, he proceeded with that defense and argued that the three witnesses called by the State supported it. He was not required to nor did he specify to the state habeas court what was contained in those statements that was the basis for a strategic decision. As noted, those statements are not part of the record provided to this court and were not read by the state habeas judge.

█ On the record currently before the court, it cannot be found that counsel made a reasonable decision that further investigation of Holmes' alibi defense was unnecessary. Trial counsel's failure to investigate the alibi witnesses appears to have been more a matter of convenience than a tactical decision. Boal testified that his failure was due to Holmes' not bringing the potential witnesses to his office. Counsel had a duty to contact the potential witnesses unless he made a rational decision that investigation was unnecessary. *Montgomery v. Petersen,* 846 F.2d 407, 413 (7th Cir.1988).

█ Trial defense counsel admitted at the state habeas hearing that he relied upon an alibi defense but did not contact or present any potential alibi defense witness other than defendant. The only circumstance that mitigates counsel's failure is his testimony that defendant agreed to have those witnesses initiate contact with defense counsel but failed to follow through. Even taking this testimony as true as did the state court, where the defendant is an 18 year-old 9th grader, counsel should not have relied solely upon him to marshal this crucial evidence. Once Holmes provided his trial counsel with the names and locations of potential alibi witnesses, it was unreasonable for counsel not to make some effort to interview all these potential witnesses to ascertain whether their testimony would aid an alibi defense, especially after his client's repeated failure to produce them up to the day before trial. Boal admittedly made no effort to ascertain whether any of these witnesses might have knowledge of facts favorable to the defense beyond their statements elicited during police questioning. A defense counsel cannot rely upon police investigators and the prosecutor to examine alibi witnesses in such a way as to garner evidence favorable to the defense. The record currently before the court does not support a finding that defense counsel made a reasonable strategic choice after thorough investigation.

█ This court has studied the transcript and the limited state court records presented, in an effort to discern from the totality of the circumstances and all the available state court evidence, what actions defense counsel Boal took to prepare for and represent Holmes at trial. It plainly appears that the bulk if not all of defense counsel's preparation in this case was to look at the prosecutor's open file. As the attorney representing Holmes aptly pointed out to the trial judge hearing the first 60–1507 motion, this was not a traffic case: "we're talking about a case where this young man faces the rest of his life in an institution. Minimal defense effort relying on law enforcement personnel is not sufficient." (HC1 at 125–26.) It does not appear to be disputed that Boal never met with Holmes to prepare for trial on this case, and that they only discussed it briefly, once, by phone. There is no indication in the record that Boal was present at the photo array display, the line up, the taking of the statements of any witnesses or that he interviewed any witnesses, defense or prosecution. There is certainly no evidence that Boal ever discussed with Holmes his decision not to call any alibi witnesses other than his mother.

The court, in considering the record, has focused not only on alleged errors or omis-

sions, but also on what action defense counsel took on behalf of Holmes. *Coleman v. Brown*, 802 F.2d at 1236. He gave his best effort at objecting to the aggravated kidnaping charge on the basis that it was not a separate crime. He unsuccessfully moved to dismiss at the close of the State's case arguing in general that the evidence was insufficient, but mainly that the aggravated kidnaping was not a distinct incident from the rape. Boal testified that he went to the scene of the crime (HC1 at 37). He effectively cross examined some witnesses. He did object to the hearsay nature of Triplett being allowed to testify as to what his cousin Ricky Miller had allegedly told him[21]. He argued the weaknesses in the victim's identification in closing and suggested that Triplett was a more likely accomplice to Miller than Holmes. However, the court questions whether these positive actions were sufficient to amount to effective assistance in spite of his failure to interview and present potential alibi witnesses.

■ Contrary to this court's approach, the state courts did not discuss any of the specific actions or inactions of defense counsel before or during Holmes' trial. For example, at the first 60–1507 hearing, the judge chastised Holmes for not informing him during the trial that he was dissatisfied with counsel's failure to call alibi witnesses, and said that Holmes should have complained before he was convicted. In other words, the judge faulted Holmes for not raising his ineffective assistance of counsel claim at trial (HC1 at 130–31). However, the judge did not base his decision to deny post conviction relief entirely on this omission. Instead, he stated, without finding any facts regarding defense counsel's actual preparation or performance at trial in this particular case, that "Mr. Boal, back in 1979, as he is today, was a very adequate and competent trial counsel." (HC1 at 133.) This court may find merit to a habeas application where a state court decision is based on an unrea-

sonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2). The court's review of the current record leads it to question the effectiveness of defense counsel's representation in this case.

If this court were to find that Holmes has demonstrated deficient performance by counsel, he would still need to prove prejudice by demonstrating a reasonable probability that counsel's errors affected the outcome of his trial. Thus, the court now considers the prejudice prong of the *Strickland* test.

The court has weighed the strength of the testimony of persons Holmes named as potential alibi witnesses which has been produced. The actual testimony of the five potential alibi witnesses taken together casts doubt on the State's case. However, three of those witnesses testified at trial despite not being called by the defense, and their testimony did not persuade the jury to reject the State's evidence. Holmes has not shown what different, more favorable testimony those three witnesses would have given had they been interviewed and called by defense counsel or that additional favorable evidence would have been produced beyond that elicited by defense counsel's cross-examination of these three witnesses.

■ The testimony of Holmes' mother and one other uncalled alibi witness presented at the first 60–1507 hearing is the type of evidence Holmes needed to produce to support his claim. However, the mother's testimony must be discounted because counsel testified at the state hearing that she, defendant and he made a decision not to call her as a witness. In a federal habeas action, the facts must be viewed in the light most favorable to the State. Mrs. Holmes' testimony is also given less

---

**21.** The prosecutor stated he wasn't going into that (T. at 257); but proceeded to ask Triplett if Miller had admitted the crimes to him, and Triplett said he had.

weight because of her relationship to defendant.

The testimony of Neil Phelps White is thus the only new testimony of a potential alibi witness which petitioner presented to the state court to support his claim. Part of that testimony even contradicts Holmes' testimony at trial that he was walking his dog in the afternoon and started playing frisbee right before dark. White testified the boys were together "about all afternoon." This court is not convinced that this bit of additional alibi evidence would have produced a different result.

■■■ Holmes bases his claim on counsel's failure to call all the alibi witnesses. Having two or three additional persons testify that they were in fact playing frisbee with Holmes around the time the rape occurred might have convinced a member of the jury that the victim was mistaken in her identification. A juror hearing such additional testimony might have been more inclined to focus on the weaknesses in the State's case, namely the weakened eyewitness testimony and the credibility questions concerning the corroborating witness. However, Holmes has had the opportunity but has not produced the testimony of the other potential alibi witnesses who were not called. He did not produce the remaining three named alibi witnesses at the state habeas proceedings and has never even presented statements from them that they were willing and able to testify and summarizing their testimony. Holmes is not entitled to an evidentiary hearing in this court to present additional evidence which he failed to develop at evidentiary hearings provided in state court. There is simply no showing that alibi testimony which was not produced at trial would more effectively have countered the eyewitness identification and corroborating testimony. Thus, Holmes has not alleged specific and particularized facts, which, if proved, would entitle him to relief. *Stouffer* at 1168, *citing Hatch v. State of Oklahoma,* 58 F.3d 1447, 1471 (10th Cir.1995).

■■■ This case is difficult because this court might have viewed the trial evidence differently than the jury. The court agrees with the state court, that the record contains overwhelming evidence that the victim was raped. However, in this court's view, the record does not contain overwhelming evidence of Holmes' guilt. *See Lawrence,* 31 F.3d at 668. Rather than overwhelming evidence, the State's case hinged on the relative credibility of the victim and two corroborating witnesses as against Holmes and his alibi witnesses. The prosecution, the jury and the state courts seem to have credited the victim's identification testimony, and faulted the alibi witnesses' testimony because of discrepancies in estimates of times. Even if petitioner has demonstrated that the weaknesses in the State's case could have been weighed more heavily, the eyewitness and corroborating witness testimony given less credence, and the alibi witness testimony found to be more supportive than they were by the jury, this court is unquestionably without authority to reweigh the evidence in this federal habeas corpus action. *See Lucero v. Kerby,* 133 F.3d 1299, 1312 (10th Cir.1998); *Messer v. Roberts,* 74 F.3d 1009, 1013 (10th Cir.1996); *Grubbs v. Hannigan,* 982 F.2d 1483, 1487 (10th Cir.1993).

The court concludes that Holmes has failed to present facts showing a reasonable probability that the outcome of his trial would have been different had defense counsel interviewed and called all the named alibi witnesses.

## RACIAL BIAS OF STATE JUDGE

■■■ Petitioner is not entitled to federal habeas relief on his claim that the state judge hearing his first 60–1507 motion exhibited racial bias by holding his attorney to a lesser standard to obtain alibi witnesses. Petitioner is not claiming and does not present any facts that this judge exhibited racial bias which prejudiced his criminal trial. The issue of defense counsel not contacting alibi witnesses was never raised or addressed at trial. At most, petitioner is alleging racial bias that led the judge to deny his first state post-

conviction motion. Judge Cook's remark and his denial of the first 60–1507 motion have not been given deference in this court's consideration of petitioner's claim that counsel was ineffective for failing to interview alibi witnesses.

## CONCLUSION

The court has thoroughly reviewed the transcripts of the state trial and post-conviction proceedings in this case, together with the facts, evidence and arguments presented by petitioner, and cannot find that the state court criminal trial resulted in a decision that was contrary to clearly established federal law or was based on an unreasonable determination of the facts. While petitioner might be able to demonstrate that his counsel's performance was deficient, he has not presented a comprehensive showing of information which would have been obtained from further investigation and that such information would have produced a different result at trial.

IT IS THEREFORE BY THE COURT ORDERED that this action is dismissed and all relief denied.